MEDINA & MEDINA, Plaintiff,

v.

COUNTRY PRIDE FOODS LTD., Defendant.

Civ. No. 81–2310 (RLA).

United States District Court,
D. Puerto Rico.

March 21, 1986.

As Amended April 30, 1986.

Luis E. Dubón, Jr., Dubón, Dubón & Vázquez, San Juan, P.R., for plaintiff.

Diego A. Ramos and Salvador Antonetti, Fiddler, González & Rodríguez, San Juan, P.R., for defendant.

## OPINION AND ORDER

ACOSTA, District Judge.

This is a diversity of citizenship suit commenced by Medina & Medina (Medina) against Country Pride Foods Ltd. (Country Pride) seeking damages for alleged breach of a distribution agreement in violation of Act 75 of June 24, 1964, as amended, 10 L.P.R.A. § 278, *et seq.* (Act 75), unjust enrichment and conversion.

Country Pride counterclaimed on grounds of fraudulent misrepresentation and intentional interference with prospective economic advantages.

Present before us for disposition are defendant's motion for summary judgment filed on June 20, 1984 (Docket No. 43) and plaintiff's cross-motion for summary judgment of July 19, 1984 (Docket No. 45), together with their respective oppositions and replies.

### UNCONTESTED FACTS [1]

1. Medina is a mercantile partnership established since May 1, 1979.

2. Country Pride is a corporation organized under the laws of the United Kingdom, with offices in Arkansas.

3. On July 19, 1977, J–M Poultry Packing Company Limited, Country Pride's predecessor, appointed Medina its "exclusive agent and distributor for all (their) products in (Puerto Rico)".

4. The Country Pride program in Puerto Rico consisted of selling Grade A frozen poultry items (whole bird legs, breasts, gizzards, etc.) labeled under the Country Pride trade name and supported by an aggressive advertising campaign (point of sale and otherwise).

5. From the time the Country Pride program was introduced in Puerto Rico, a for-

1. Submitted by the parties as part of the joint pretrial order filed on December 16, 1983 (Docket No. 38).

mula price structure based on the Georgia dock prices was used for chicken items and open market pricing was used for other poultry items.

6. From time to time adjustments were made to the formula price structure by mutual agreement.

7. In March 1978, Country Pride demanded higher prices for its products. In May 1978, Medina accepted an increase in prices. In June 1978, Country Pride started to demand additional increase in the prices for the sale of its products to Medina.

8. On October 24, 1978, Jerry R. Nelson, Country Pride's executive in charge of sales gave Medina a thirty-day notice to change the formula's rigid pricing structure then in effect to an open market pricing structure.

9. During the early part of November 1978, the parties met to discuss, among other things, the new open market policy proposal. Thereafter, on November 14, 1978, Country Pride changed its original proposal to a formula arrangement of higher prices than the ones existing, to begin on December 1, 1978 for a ninety-day try-out period.

10. On November 21, 1978, Medina analyzed and rejected the new formula and counterproposed a new one at lower prices than requested by Country Pride.

11. On November 22, 1978, Country Pride compromised and advised that Medina's November 21, 1978 formula was acceptable for a ninety-day period, but all deliveries were to be C.I.F. San Juan and payment by sight draft against ocean bills of lading.

12. Later, on that same date, Medina advised that four and one-half cents (4.5¢) could be added to the formula to make prices C.I.F. San Juan, but that the sight draft payment condition was unacceptable.

13. On November 27, 1978, Country Pride restated its position: (a) Medina's prices at Country Pride's payment terms or (b) open price formula. A reply was requested by the next day.

14. On November 28, 1978, Medina rejected the new payment terms alleging prior experience of shortages and overages in the shipment of products and prior experience of shipments of out-of-date products. Medina counterproposed to pay sight draft payable fifteen days after receipt of the product.

15. On November 28, 1978, Medina urged Country Pride to reconsider its offers.

16. On November 29, 1978, Medina again urged Country Pride to reconsider and asked for any other alternatives which Country Pride could choose to offer.

17. On November 29, 1978, Country Pride advised that it wanted to do business with Medina, but needed price relief immediately.

18. On November 30, 1978, Medina again explained why it rejected both offers of Country Pride.

19. On November 30, 1978, Country Pride insisted upon its previously stated position.

20. That same day, Medina restated its previous argument and an impasse was reached in the negotiations.

21. On December 4, 1978, Country Pride advised Medina that a shipment of goods was sent and payment was due by sight draft against ocean bills of lading.

22. On December 6, 1978, Medina advised that it was reexamining its previous position and studying the possibility of making a new proposal.

23. On December 7, 1978, Medina made a third proposal relative to payment terms, to wit: payment seven days after receipt of product, such terms to be in effect for a ninety-day trial period.

24. On December 7, 1978, Country Pride rejected Medina's third proposal and made its offers clear: "(1) our price, your credit terms, (2) your price, our credit terms". In view of the impasse, Country Pride announced withdrawal from Puerto Rican market.

25. On that same date, Medina accepted Country Pride's withdrawal from the Puerto Rican market.

26. On December 8, 1978, Country Pride requested payment for the last shipment due on December 3, 1978.

27. On December 11, 1978, Medina advised that payment for the goods was forthcoming later, following pre-November payment terms.

28. On December 11, 1978, Country Pride made an offer of delivery of last shipment and demanded a transfer of funds against commercial invoice to be telexed.

29. On December 12, 1978, Medina advised that under pre-December 1 delivery and payment terms, title to shipped goods passed upon tender to carrier at port of shipment to Medina and Country Pride and no right to condition delivery until payment of the goods.

30. On that same date, Country Pride rejected Medina's claim and also advised that the agency agreement was terminated.

31. Medina paid Country Pride for all products delivered and has no outstanding balance due to Country Pride.

## ARGUMENT

### I. THE COMPLAINT

#### A. *Act 75 Claim*

##### 1. *Timeliness*

■ Defendant contends the action filed on December 3, 1981 under Act 75 is time-barred. A review of the documents submitted, however, indicates otherwise.

It is not until December 12, 1978 that plaintiff was advised that the agency agreement was terminated. (App. 205.)[2] The pertinent statute provides that suits must be filed within three years from the final termination of the distribution contract or from the detrimental acts to the relationship as the case may be.[3] Prior to

December 12, 1978, the parties were still attempting to reconcile their differences in pricing and an amicable solution was still a viable alternative. Accordingly, the complaint filed on December 3, 1981 was timely.

##### 2. *Price and/or Credit Terms and Right to Withdraw from the Puerto Rico Market*

Because these two arguments are so intertwined, they will be discussed together.

The primary concern in enacting Act 75, also known as the Dealer's Act, was the protection of distributors in Puerto Rico when contracts were arbitrarily concluded after they had created a favorable market for the product within this jurisdiction. To this effect, the statement of motives for this piece of legislation reads:

> The Commonwealth of Puerto Rico cannot remain indifferent to the growing number of cases in which domestic and foreign enterprises, without just cause, eliminate their dealers, concessionaries, or agents, as soon as these have created a favorable market and without taking into account their legitimate interests. The Legislative Assembly of Puerto Rico declares that the reasonable stability in the dealer's relationship in Puerto Rico is vital to the general economy of the country, to the public interest and to the general welfare, and in the exercise of its police power, it deems it necessary to regulate, insofar as pertinent, the field of said relationship, so as to avoid the abuse caused by certain practices.

###### a. *Just Cause*

Act 75 provides that no principal may terminate a distribution relationship except for "good cause". 10 L.P.R.A. § 278a. The term "just cause" is defined in the statute as: "Nonperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adverse-

---

**2.** Appendix submitted with defendant's motion for summary judgment on June 20, 1984.

**3.** 10 L.P.R.A. § 278d.

ly and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service." 10 L.P.R.A. § 278(d).

■ It is evident from a reading of this provision that only the dealer's acts or omissions may constitute just cause under the statute. The Supreme Court of Puerto Rico held in *Warner Lambert Co. v. Tribunal Superior,* 101 D.P.R. 378, 400 (1979):

It should be noted that the just cause is limited to acts imputable to the dealer. Only when the dealer fails to comply with any of the essential conditions or adversely affects in a substantial manner the interest of the principal, may the latter terminate the contract without payment for damages. The Act does not admit the good faith of the principal in the termination of the contract, nor his right to establish his own distribution system or to make adjustments in the system which in good faith he considers necessary to improve his market.

(Official translation of the Supreme Court of Puerto Rico.)

■ In its definition of "just cause", section 278a makes reference to two situations, either the dealer's failure to comply with an essential obligation under the contract or any act or omission on its part that interferes with the interests of the principal in the distribution of the product.

At no time does defendant allege Medina failed to abide by any of its duties or obligations under their agreement. Defendant's representatives acknowledged the success of Medina's distribution system in Puerto Rico and were impressed with its operation.

The internal documents of the defendant's business, as well as the letters sent to Medina, show that Country Pride was impressed with plaintiff's facilities and its business acumen. They acknowledged plaintiff's success in developing a market and were satisfied with Medina as a customer. (App. 37–39, 61, 63–64, 70–71, 73, 85.)

If indeed problems arose during the duration of their relationship, the evidence points instead towards problems at defendant's end and never due to plaintiff's failure to meet its obligations.

It is interesting to note that defendant's performance was consistently plagued with errors. The recurring problems in filling orders can be noticed up to the end of their business relationship. The December 7, 1978 (App. 198) telex from Medina to Country Pride makes reference to the fact that the recent shipment consisted of out-of-date products.

From the very onset of their relationship, there were problems with the weight of the products shipped, labels, packaging, shortages or overages, freezer-burnt products, inconsistency in available supply, discrepancy between what was ordered and what was shipped, orders not filled properly, timing of orders and shipment of out-of-date products. (App. 38, 43–44, 47, 50–52, 54–55, 61, 65, 94, 107–09, 111, 120, 124, 128, 133–34, 146–47, 149–151, 155, 182, 187, 198.)

There is no controversy over the fact that, during the course of approximately a year and a half, Medina was able to significantly develop a favorable market for defendant's products in Puerto Rico.

Defendant has also failed to point to any acts or omissions on the part of the dealer which interfered with its interests as principal in the distribution of the Country Pride products in Puerto Rico. The only ground for termination has to do with the failure to agree on price/credit terms. Accordingly, we find the "just cause" defense has not been established.

Instead, we have before us conditions sought to be imposed by the principal which are unacceptable to the distributor. Under these circumstances, our analysis should be geared to the reasonableness of the principal's conduct in seeking to modify the price formula agreed upon by the parties, which had already been in effect for a period of time.

Defendant contends it is entitled to withdraw from the Puerto Rico market without incurring in the liability imposed by the local statute. However, it appearing its decision to withdraw came about as a direct consequence of the price/credit terms impasse, the controversy before the Court must be phrased in terms of the reasonableness of its demands pertaining to the price formula and the validity of plaintiff's denial.

### b. *Rebus Sic Stantibus*

It has been suggested that the doctrine of *rebus sic stantibus* should be available to both a distributor and principal as a valid excuse for either non-performance of an obligation or termination of a business relationship. As to the applicability to a principal, it has been stated:

> On the other hand a principal's economic inability to continue a distributorship relationship should allow the principal to terminate the same without the awarding of damages to the distributor because of impossibility of performance. The *rebus sic stantibus* remedy should also be available to a principal in order to balance extremely burdensome inequities that could arise during the cause of the relationship.

Paul Salomone, "Puerto Rico's Distributor's Law: Law 75: A Primer", Vol. XVIII *Revista Juridica de la Universidad Interamericana de Puerto Rico,* September-December 1983, Vol. 1, p. 67 at 106–07.

■ *Rebus sic stantibus* allows for the modification of conditions in a contract or even its termination when unforeseen changes in the circumstances are such that it is too burdensome or impossible for a party to comply with its duties. It is, however, an extraordinary remedy to be applied only in extreme circumstances. It also allows the Court to tailor the remedy to the particular case at hand to ensure it is a fair and equitable one.

■ The determining factor justifying judicial relief under this doctrine is the unforeseeable nature of the change that has taken place. *Casera Foods, Inc. v. E.L.A.,* 108 D.P.R. 851, 858 (1979).

### (1) *Price/Credit Terms*

■ According to the record, the decision of Country Pride to terminate the distribution agreement came about because the parties were not able to agree on the price/credit terms. (App. 199.)

The letter of July 19, 1977 appointing Medina exclusive distributor in Puerto Rico and the United States Virgin Islands (App. 49) does not indicate the price formula agreed upon by the parties. The stipulated facts in the pretrial order filed on December 16, 1983 (Docket No. 38) indicate, however, that since the beginning "a formula price structure based on the Georgia dock prices was used for chicken items and open market pricing was used for other poultry items." (Para. 5.) Throughout the duration of their business relationship, the parties periodically agreed to make adjustments to the formula price structure. (Para. 6.)

It is difficult, if not impossible, for the Court to determine the reasonableness of Country Pride's suggested price and credit term modifications based on the record submitted by the parties. Defendant consistently alleged its prices elsewhere were higher, but the evidence does not necessarily establish that Country Pride was not making a profit in Puerto Rico or that the circumstances prompting the change in market conditions were unforeseen.

There are numerous references in the record to differences in price of Country Pride products sold to Medina and to other export customers and also alleged prices charged by other poultry processors.

According to Country Pride's report of February 24, 1978 (App. 59–60), the gross profit per pound sold to Medina utilizing a fixed rate over Georgia dock was Three Dollars and Sixty-Five Cents ($3.65), whereas it was Seven Dollars and Twenty-Four Cents ($7.24) to other export customers negotiated in most cases in advance of the market quote. The report concluded that a decrease in gross profits was expected.

According to a memorandum dated March 28, 1978, Country Pride confronted Medina with the difference in price versus cost on each item sold as fresh product in the Continental United States and in Puerto Rico. Although Medina agreed upon a price increase on certain items, it could not agree on discontinuing the price formula. (App. 71.)

On March 31, 1978, Medina was advised a new comparison of profit and loss of each item sold to plaintiff and to other customers would be prepared. (App. 76.)

The opinion of Rick Daniel, Export Sales Manager, in an October 19, 1978 memorandum was that the pricing structure in effect with Medina was "far underpriced for a branded program". (App. 140.) He was concerned with the difference with the competition's current price and suggested Country Pride should get "a fair market value" for its product. (App. 141.) His opinion was that the Country Pride's program was a money-losing proposition in Puerto Rico and needed immediate price relief to justify the Country Pride value added program.

His suggested options were: (1) to offer Country Pride along with other products on an adjusted price basis; or (2) an open market basis for all products; or (3) pulling away from Medina and selling directly.

On October 24, 1978 (App. 148), Country Pride advised the changing market conditions during the past year required Country Pride to raise its prices. Accordingly, effective December 1, 1978, it would sell at current open-market prices with the expectancy of the same volume demand. The effective date of the new formula was notified again on October 30, 1978. (App. 158.)

On November 14, 1978, Medina was supplied a new formula price list, rather than the recommended open pricing arrangement. According to Country Pride, the increase in prices responded to the need "to begin realizing a return on our investment in the Puerto Rican market and to avoid suffering continued losses that have been incurred by us for the past year." (App. 172.)

Medina responded, on November 21, 1978 (App. 177), that the new formula was unacceptable and gave its reasons. In addition, it argued that for Country Pride "losses" meant that it could have realized a bigger profit on the product had it been sold elsewhere. Medina also presented a formula pricing counterproposal. Country Pride responded on November 22, 1978 (App. 179) accepting Medina's pricing proposal for a ninety-day period commencing December 1, 1978, but all sales to be C.I.F. San Juan and payment by sight draft with ocean bills attached. Country Pride further advised the cost of the program in Puerto Rico and that on a long term basis it could not sell its products to Medina for a lower price than to the rest of its customers.

On November 27, 1978 (App. 181), Country Pride offered either C.I.F. payment by sight draft with ocean bill of lading attached or the original price formula of November 14, 1978 telex. All shipments for delivery the following week were to be paid on the basis of Medina's price formula according to the November 21, 1978 telex, but with Country Pride's payment terms.

On November 28, 1978 (App. 182), Medina argued the sight draft terms were unacceptable due to consistent errors in filling out the orders and out-of-date shipments and proposed to pay sight draft, but payable fifteen (15) days after receipt.

On November 28, 1978 (App. 183), Country Pride advised that:

1. Products shipped that week, if ordered by November 29, 1978 noon, would be subject to the old pricing formula but sight draft, ocean bill of lading attached since these would not arrive until after December 1, 1978.

2. Products shipped after December 1, 1978 would be subject to either Country Pride's open market terms or Medina's prices with sight draft ocean bill of lading attached.

Country Pride stated that should Medina reject the proposal, their relationship would be terminated. Medina answered and complained of Country Pride's attitude (App.

185) stating it had given reasons for its counterproposal, whereas Country Pride's only argument in support of its position was a "method" excuse.

On November 29, 1978 (App. 186), Country Pride responded by explaining that its position "was simply one alternative that we reached in trying to begin to realize something near values received from other customers." The program in Puerto Rico had cost defendant "a great deal of money".

On November 30, 1978 (App. 188), Country Pride stated its decision "to sell on sight draft basis is one based on our best business judgment."

It is interesting to note that during the last week of the negotiations, Country Pride did not object to Medina's pricing formula if paid immediately, which could indicate the prices offered by Medina were not so disadvantageous.

### (2) Security/Guarantee

Plaintiff's good faith efforts in attempting to reach an amicable solution to the price problem can be deducted from its willingness to provide security for their credit.

Medina agreed to sign any kind of personal guarantee to ensure payment, including a note for Two Hundred Fifty Thousand Dollars ($250,000.00). (App. 71.)

A pledge agreement was entered into on August 18, 1978 (App. 113–16) whereby Medina agreed to make payment of product within fifteen (15) days of onloading by carrying vessel. A security of Two Hundred Fifty Thousand Dollars ($250,000.00) was given.

On November 22, 1978 (App. 180), Medina complained of the proposed credit terms (sight draft) with ocean bills attached and stated these conditions were unnecessary in view of its past payment performance. In addition, Medina stated it had agreed to the promissory note and pledge agreement for Two Hundred Fifty Thousand Dollars ($250,000.00), which it had not given anyone else.

According to Country Pride, the C.I.F. payment by sight draft with ocean bill of lading attached was used "in all of our other export business in our company." (App. 181.)

On December 7, 1978 (App. 199), Country Pride advised Medina it was forced to immediately withdraw from the Puerto Rico market for an unspecified period of time, but was willing to sell Medina "at your price on a cash basis".

It would seem defendant's primary concern was a profit increase at all costs.

### (3) Puerto Rico Market

It is apparent from the record Puerto Rico presented a good market for products that were not in great demand elsewhere.

On March 2, 1978 (Tr. 61), Bob Merkle, President of Country Pride, reported Medina was requesting particular turkey and chicken parts which were the most difficult items to move in the turkey and chicken business and "would greatly complement cutting program at /the plant at/ Carthage." (App. 62.) He was also interested in marketing duck parts. The report reads: "As you know, we have a particular problem with undergrade ducks at Carthage and this would certainly be something that we should explore as soon as possible." (App. 62.)

He noted the particular need in Puerto Rico for over forty thousand (40,000) pounds of thighs for the local "chicharrones" dish which, if produced, would make available a much larger outlet for thighs. This could also be marketed in New York due to the large Puerto Rican population there. Puerto Rico also presented a good market for hind quarters. (App. 63.)

Country Pride derived a benefit from the ratio of dark to white meat sold in Puerto Rico. (App. 92.)

### (4) Alternate Clients in Puerto Rico

There is evidence that, as early as August 7, 1978, Country Pride was looking for alternate routes to the sale of its products in Puerto Rico, which might indicate it had an ulterior motive in discontinuing business

with Medina and the price controversy was only an excuse.

In the memorandum from Jerry Nelson to other Country Pride personnel, defendant was already contemplating the possibility of convincing Medina to allow Country Pride to sell undergrade products directly to other customers in Puerto Rico under a different brand name, giving Medina a commission on these sales for advertising reserve. (App. 91.)

On October 13, 1978 (App. 131), Rick Daniel advised Jerry Nelson the prices of products sent to Puerto Rico from other sources according to information supplied by Joe Vásquez, a broker in New Orleans.

Upon discussion with other processors, defendant concluded its Country Pride program was a money-losing proposition in Puerto Rico, which could only work with an increase in prices to justify the Country Pride value added program. (App. 140–41.) The options to be considered were to offer Country Pride along with undergrade product (Dixie) on an adjusted price basis, utilize an open market basis for all products and end the exclusivity agreement with Medina and sell directly. In the opinion of Rick Nelson, Puerto Rico could be a good profitable market, but Country Pride had to get a "fair price". In the event Medina was unavailable for this, defendant would sell together with other products to other wholesalers at open market prices.

On October 24, 1978 (App. 148), Jerry Nelson advised Medina Country Pride needed price relief and also mentioned the possibility of Country Pride introducing "new labels covering other poultry products" through its own marketing and sales personnel in the future. (App. 148.) In the meantime, Country Pride encouraged Medina to buy poultry products from other suppliers. (App. 156–58.)

There is also evidence of instances of "unauthorized" direct sales to Puerto Rico.

On November 7, 1978 (App. 165), defendant acknowledged that due to "human error" at its Carthage plant, a direct sale had been made to Amigo, a Puerto Rico local supermarket and offered a brokerage fee for this sale. (App. 166.)

On January 12, 1979 (App. 210), Medina complained to Country Pride that its product was being marketed by another local firm. In response (App. 211), Country Pride stated it did not plan to market any product in Puerto Rico "in the near future" and none had been sold since the relationship had ended.

On November 28, 1978 (App. 215), Country Pride offered Medina a non-exclusive arrangement. Representatives met with Pepin Medina during January 1980 (App. 265–66), trying to reach an agreement to enter the Puerto Rico market after one year offering Pepin Medina to sell both through Medina and directly to customers with payment of broker fees.

On January 25, 1980 (App. 266), defendant met with another local distributor to discuss Medina and the Puerto Rico market.

As mentioned earlier, the documents justifying the "price relief" requested by Country Pride are not conclusive. There is evidence suggesting defendant's intention was rather to seek alternatives to derive higher profits in the Puerto Rico market. There is uncontroverted evidence of Medina's capable performance and credit soundness. On the other hand, the record also reflects efforts of Country Pride in search for alternate clients.

Defendant has failed to establish its inability to continue under the terms of the agreement on economic grounds. In addition, there is no evidence in the record identifying the alleged circumstances prompting the increase in price, much less that these were unforeseeable. Accordingly, we do not find sufficient grounds to apply the *rebus sic stantibus* doctrine in this case.

B. *Unjust Enrichment*

As a second cause of action, plaintiff alleges that commencing July 1978 "Country Pride began to impair its relationship with Medina until finally, on December 12,

1978, Country Pride, unilaterally cancelled and terminated its agreement with Medina." (Paragraph 10.) Plaintiff claims that, as a result of the termination, defendant "has unjustly enriched /sic/ at the expense of Medina, who suffered damages amounting to the sum of One Million Three Hundred Fifty Thousand Dollars ($1,350,-000.00), which Country Pride must indemnify and pay to Medina." (Paragraph 11.)

These allegations are identical to those charged as violation of Act 75 and the damages claimed thereunder at Paragraphs 7 and 8.

■ Unjust enrichment is a doctrine based on equity of general application to all situations where its "nonapplication would perpetuate the inequity that someone may unjustly enrich himself at the expense of another." *Silva v. Industrial Commission*, 99 P.R.R. 865, 871 (1965).

■ An action brought under the doctrine of unjust enrichment is subsidiary in nature and will only be available in situations where there is no available action to seek relief. *El Toro Electric Corp. v. Zayas*, 106 D.P.R. 98 (1977).

■ It appearing Act 75, at 10 L.P.R.A. § 278b, provides that the termination of the dealership contract without just cause amounts to a "tortious act" and imposes upon the principal the obligation to indemnify the dealer for all damages caused, we see no grounds for allowing Medina to prosecute its unjust enrichment claim. The general principles of tort damages apply to the computation of damages for violations of Act 75. *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 90 (1983).

### C. *Unlawful Conversion*

It appearing plaintiff voluntarily dismissed its third cause of action in the complaint based on unlawful conversion,[4] this claim is hereby dismissed.

---

4. Plaintiff's memorandum of law filed on July

## II. *COUNTERCLAIM*

### A. *Breach of Fiduciary Duty*

■ The first claim for relief charges plaintiff with a breach of its fiduciary duties towards defendant based on alleged misrepresentations which had "the purpose and effect of unjustly enriching" Medina. (Paragraph 7.)

Plaintiff moved the Court to dismiss this claim on grounds that it was one for unjust enrichment and the required elements were not met, including the fact that defendant had an adequate remedy available by way of a tort action.

The allegations of the counterclaim appear instead as stating a cause of action based on misrepresentation, a tort. Unless defendant shows the Court otherwise on or before April 21, 1986, this claim shall be dismissed as time-barred pursuant to the one-year statute of limitations applicable to actions sounding in tort. 31 L.P.R.A. § 5298(2).

### B. *Intentional Interference*

■ The second claim for relief asserted in the counterclaim is an "intentional *tort* of interference with /defendant's/ prospective economic advantages". Country Pride's Theory, p. 3, filed with pretrial order on December 16, 1983 (Docket No. 38) (emphasis ours).

This claim is time-barred under the one-year statute of limitations applicable to actions sounding in tort. 31 L.P.R.A. § 5298(2). Accordingly, it is hereby dismissed.

### CONCLUSION

Based on the foregoing, defendant's motion for summary judgment filed on June 20, 1984 (Docket No. 43) is denied as to the Act 75 claim. The unjust enrichment claim and unjust conversion claim set forth in the complaint are dismissed.

As to the counterclaim, plaintiff's cross-motion for summary judgment filed on July 19, 1984 (Docket No. 45) is granted insofar

---

19, 1984 (Docket No. 45) at p. 24.

as the intentional interference claim is dismissed. Defendant shall advise the Court in writing, on or before April 21, 1986 why the breach of fiduciary duty should not be considered as a tort action.

IT IS SO ORDERED.