**OCASO, S.A. COMPAÑIA DE SEGUROS Y REASEGUROS, Plaintiff,**

v.

**PUERTO RICO MARITIME SHIPPING AUTHORITY, et al., Defendants.**

Civil No. 86–0576(RLA).

United States District Court,
D. Puerto Rico.

Jan. 11, 1996.

Francisco A. Besosa, Axtmayer Adsuar Muñiz & Goyco, San Juan, P.R., for plaintiff.

William A. Graffam, Jimenez Graffam & Lausell, San Juan, P.R., Dario Rivera Carrasquillo, Cordero Miranda & Pinto, San Juan, P.R., Dominguez & Totti, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

ACOSTA, District Judge.

OCASO, S.A., COMPAÑIA DE SEGUROS Y REASEGUROS ("OCASO") instituted these proceedings against its insureds and various intermediaries[1] alleging that it was induced into providing insurance coverage through fraudulent misrepresentations and omissions.

### THE FACTS

1. Plaintiff, OCASO, S.A. ("OCASO") is an insurance company organized and operating under the laws of Spain with its principal place of business in Spain.

2. Codefendant PUERTO RICO MARITIME SHIPPING AUTHORITY ("PRMSA") is an instrumentality of the Commonwealth of Puerto Rico duly organized and existing pursuant to Laws of P.R.Ann., tit. 23 §§ 3051 et seq. (1987).

3. Codefendant PUERTO RICO MARINE MANAGEMENT, INC. ("PRMMI") conducts PRMSA's day-to-day operations and manages PRMSA's vessels.

---

1. The following are the individuals and entities who participated in the process of procuring the insurance at issue:
 J. MICHAEL **GRIFFITHS**
 (OCASO, S.A.)
 MICHAEL **HICK**
 (OVERSEAS REINSURANCE MARKETS CO., INC.)
 JAMES R. **WINING**
 (WORLD AMERICAN UNDERWRITERS, INC.)
 CHARLES R. **HALL**
 JAMES **CRIST**
 (FINANCIAL GUARDIAN)
 PRMSA/PRMMI

4. PRMSA and PRMMI, also referred to collectively as "NAVIERAS", are engaged in the business of common carriers by sea and transport cargo on a regular basis to and from various ports of the United States and Puerto Rico.

5. NAVIERAS decided to take over its own stevedoring operations in the port of Elizabeth, New Jersey, commencing in **June 1981**. These operations had been previously carried out by UNITED TERMINALS, INC., an independent stevedoring contractor.

6. NAVIERAS notified its insurance broker, FINANCIAL GUARDIAN, INC., through CHARLES HALL, of its decision to undertake its own stevedoring operations in Elizabeth.

7. CHARLES HALL was the account executive in charge of the NAVIERAS' account with FINANCIAL GUARDIAN.

8. From **January 1981 through late 1983** JAMES CRIST worked as an insurance consultant for FINANCIAL GUARDIAN under the direct supervision of CHARLES HALL.

9. MR. CRIST serviced the accounts for which MR. HALL was the account executive and prepared, on behalf of FINANCIAL GUARDIAN, all pertinent underwriting submissions in this case.

10. FINANCIAL GUARDIAN had previously placed insurance on behalf of NAVIERAS with TRAVELERS INSURANCE CO., to cover NAVIERAS' liability for workmens' compensation, including U.S. Longshoremen and Harbor Workers Compensation Act ("USLHWCA"), general liability and auto liability under a retrospective rating plan effecting from **October 1, 1978 through October 1, 1981.**

11. Upon being advised by NAVIERAS of its decision to undertake its own stevedoring operations in Elizabeth, FINANCIAL GUARDIAN advised TRAVELERS of the resulting change of exposure and the need to negotiate an amendment to the existing insurance program.

12. TRAVELERS agreed to insure the additional exposure but conditioned upon limiting occurrences under the USLHWCA to $500,000.00 and that the retro plan be extended to **October 1, 1992** until an operating experience at the port of Elizabeth could be determined.

13. Because in their opinion the Elizabeth stevedoring operations could bring about a change in exposure and increase in the premium that NAVIERAS would have to pay under the retro plan with TRAVELERS, MR. HALL and MR. CRIST recommended that NAVIERAS obtain cost control insurance for the additional exposure.

14. NAVIERAS accepted FINANCIAL GUARDIAN's recommendation and FINANCIAL GUARDIAN proceeded to prepare the necessary submissions in order to locate an insurance company to underwrite the aforementioned risk.

15. All information contained in the submissions in question was compiled by MR. CRIST who had direct access to the TRAVELERS' files involving coverage of NAVIERAS, as well as the estimated payrolls for the new operations to be undertaken.

16. At all relevant times, codefendants WORLDSURANCE, INC. and WORLD AMERICAN UNDERWRITERS, INC. were wholly owned subsidiary corporations of FINANCIAL GUARDIAN. All three (3) entities were organized and operated under the laws of the State of Missouri.

17. Codefendant JAMES WINING was the president of WORLD AMERICAN UNDERWRITERS, INC. at the time of the placing of the insurance policy in question.

18. At all relevant times, codefendant ROBERT HICK, a citizen of Great Britain domiciled in Texas, was the owner of OVERSEAS REINSURANCE MARKETS, a company he established under the laws of Texas for developing mainly reinsurance business and some direct insurance business.

19. MICHAEL GRIFFITHS was OCASO's Regional Director in San Juan, Puerto Rico at the time the policy in controversy was issued.

20. Prior to approving the policy at issue, MR. GRIFFITHS had had other business dealings with MR. HICK who was also his personal friend.

21. The submissions and communications prepared by MR. CRIST were sent by him to MR. WINING, who in turn forwarded the documents to MR. HICK who, in turn, transmitted said information to MR. GRIFFITHS.

22. By way of a letter dated **August 21, 1981**, FINANCIAL GUARDIAN advised RALPH GUEVARA, then Corporate Director of PRMMI, that a quotation had been submitted by OCASO which would indemnify PRMSA for losses entering the plan premium computation [with TRAVELERS] in excess of **$1.4 million** to an aggregate indemnity to PRMSA of **$1 million** [which would be paid by OCASO].

23. The premium quoted by OCASO for the **$1 million** coverage on possible additional premiums that could be due by NAVIER-AS for the **1978–1982** retro plan term with TRAVELERS was $215,000.00.

24. MR. GUEVARA of PRMMI advised MR. HALL that the coverage offered by OCASO and the premium quoted were acceptable and FINANCIAL GUARDIAN was instructed by MR. GUEVARA to secure the coverage offered by OCASO.

25. MR. CRIST prepared a draft copy of the contract in question, forwarded the same to OCASO. Thereafter, effective **October 1, 1981** retroactive to **October 1, 1978** and through and until **October 1, 1982** OCASO insured NAVIERAS pursuant to a "Retrospective Rating Plan Loss Indemnity Certificate" Number WAU 00197 (which also carries number S–07052001).

26. PRMMI paid OCASO the premium owed under the policy in question.

27. On or about **July 11, 1983** WINING informed OCASO of a "tremendous loss deterioration to $1,879,365.00 in the PRMSA account and a loss to Ocaso's cover under covernote WAU 00197 in the amount of $479,365.00."

28. Prior to making any payments under the policy in question, MR. GRIFFITHS requested copies of the retrospective rating plan and loss runs for TRAVELERS for the term of **October 1, 1978** through **October 1, 1982**. MR. GRIFFITHS also requested a meeting with representatives of the assured, as well as FINANCIAL GUARDIAN.

29. The aforementioned meeting was held on **September 30, 1983** at GRIFFITHS' offices which at the time were located in Miami. At the conclusion of the meeting MR. GRIFFITHS requested that FINANCIAL GUARDIAN prepare for OCASO, certified retrospective adjustments and loss runs from TRAVELERS as the losses under the plan developed from **October 1, 1978** through **October 1, 1982** so these could be audited by OCASO.

30. The information described in the preceding paragraph was gathered by MR. CRIST and the pertinent documentation submitted to MR. RICHARD BYRON, who audited them on behalf of OCASO.

31. MR. BYRON, who according to MR. GRIFFITHS was "a very experienced insurance person" worked for MR. GRIFFITHS.

32. After review of the voluminous documents evidencing the losses, MR. BYRON advised MR. CRIST that everything was in order and that he would recommend to MR. GRIFFITHS that the claim be paid.

33. MR. GRIFFITHS, on behalf of OCASO, made the first payment under OCASO's policy on or about **October 28, 1983** in the amount of $479,365.00.

34. This first payment was made after MR. BYRON, on behalf of OCASO, had full opportunity to examine all TRAVELERS' loss records and MR. GRIFFITHS was satisfied the same were in order.

35. During the month of **September 1984** TRAVELERS conducted the retro rating plan adjustments for the entire term from **October 1978** through **1982**, and a review of the same showed that additional amounts were due under the OCASO policy.

36. On or about **September 7, 1984** BRUCE VERLEN, Vice–President of ALEXANDER & ALEXANDER, served OCASO with a Proof of Loss requesting payment of an additional **$520,635.00** pursuant to the Declaration of Insurance.

37. During this period of time ALEXANDER & ALEXANDER and not FINANCIAL GUARDIAN was acting as NAVIER-AS' insurance consultants/brokers.

38. On **September 27, 1984** BRUCE VERLEN advised MR. GRIFFITHS that, as a result of the **1978** adjustments of the retro plan, the aggregate loss indemnity under the OCASO policy reached **$1 million** of which **$479,365** had been paid by OCASO in **1983** and that there was a **$520,635.00** outstanding balance as per the **1984** adjustments.

39. MR. GRIFFITHS failed to respond to the repeated demands made on behalf of NAVIERAS for the payment of the outstanding balance under the terms of OCASO's policy.

40. Some time during the month of **November 1984** JOSE MARIA HORRILLO, on behalf of OCASO, contacted MR. GUEVARA advising that he was studying the file in order to make a determination with regard to the final payment and requested several documents from MR. GUEVARA which were forwarded on **November 26, 1984.**

41. MR. HORRILLO was International and Reinsurance Manager of OCASO, Director of International Activities, President of OCASO, S.A., Spain and MR. GRIFFITHS' superior.

42. MR. GUEVARA sent a telex to MR. HORRILLO on **January 4, 1985** inquiring as to the status of the claim.

43. On **January 5, 1985** MR. HORRILLO responded via telex confirming receipt of all the documentation requested and advising that MR. GRIFFITHS had resigned form the company and that a technical executive, JOSE LUIS BELLO, would be in New York in **February** to meet and conduct an in-depth investigation of the losses.

44. MR. BELLO visited Miami and New York and conducted an in-depth study of the losses.

45. MR. BELLO kept MR. HORRILLO apprised of the developments of his investigation.

46. By telex dated **March 21, 1985** MR. HORRILLO instructed two of his subordinates, MR. FERNANDEZ DE MESA and MR. BELLO, to meet with representatives of NAVIERAS and advise them of the findings of their investigation to the effect that MR. GRIFFITHS had accepted and bound OCASO for the risks under the policy in question without authority to do so, and without the knowledge and consent of the officers and directors of OCASO. HORRILLO further instructed them that NAVIERAS was to be advised that both NAVIERAS and OCASO had been victims of a swindle perpetrated by OCASO's own employee, MR. GRIFFITHS and that this had led to the expulsion of MR. GRIFFITHS from the company and a reservation of rights by OCASO against MR. GRIFFITHS for the damages caused.

47. MR. BELLO met with representatives of NAVIERAS and with MR. GUEVARA in Puerto Rico on **March 25, 1985** at which time NAVIERAS demanded payment and MR. BELLO indicated that OCASO would pay the outstanding balance of the claims but needed additional time.

48. On or about **March 25, 1985** MR. BELLO advised JAIME MAYOL, Risk Manager of NAVIERAS to inform that OCASO had approved payment of the final amounts due and that payment would be made in two installments.

49. In **April 1985** OCASO paid the first installment through check No. 03419 dated **April 2, 1985** in the amount of $250,000.00. Along with the check OCASO sent two letters dated **April 1, 1985** confirming the agreement reached and referencing the check.

One letter indicated that the payment enclosed as well as the previous payment of **$79,365** were being made "under protest" and with "full reservation of rights" since "J. Michael Griffiths accepted and bound the risks embodied in the ... policy without the authority to do so and without the knowledge and consent of the officers and directors of [Ocaso]".

The other letter contained and express waiver of any further action or legal claim against NAVIERAS.

50. Payment of the final balance of $270,-635.00 was made by OCASO on **May 31, 1985.**

## OUTSTANDING DISPOSITIVE MOTIONS

There are several outstanding dispositive motions filed by the parties to these proceedings which will be addressed in a consolidated fashion for easier reference due to overlapping complex facts and applicable law. The motions are:

1. Motion for Partial Summary Judgment Against Puerto Rico Maritime Shipping Authority and Puerto Rico Marine Management, Inc. filed by plaintiff (docket No. 113);

2. Motion for Summary Judgment filed by codefendants JAMES R. WINING, in his personal capacity, FINANCIAL GUARDIAN, INC., WORLD AMERICAN UNDERWRITERS, INC and WORLDSURANCE, INC. (docket No. 118);

3. Motion to Dismiss filed by defendants (docket No. 116).

## SUMMARY JUDGMENT STANDARD

Summary judgment will be granted in instances where no issues of material fact are present. The record will be examined in the light most favorable to the opposing party with all reasonable inferences in his favor. A genuine issue of fact entails that the trier of fact could also find for the opponent and it is the burden of the opposing party to "set forth specific facts, in suitable evidentiary form, in order to establish the existence of a genuine issue for trial." *Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 352 (1st Cir. 1992). *See also McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995).

What is material is determined by the substantive law. Only those facts in dispute that might affect the outcome of the suit under the governing law will bar the entry of summary judgment. Factual disputes which are irrelevant or unnecessary will not be considered.

*Rodriques v. Furtado,* 950 F.2d 805, 809 (1st Cir.1991).

## I. OCASO'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NAVIERAS

### —LACK OF INSURABLE INTEREST AND INSURABLE LOSS—

Plaintiff has moved the court to enter partial summary judgment in its favor finding that the insurance agreement in controversy is invalid in that NAVIERAS had no insurable interest in the policy issued by OCASO nor did it sustain an insurable loss.

Insurable interest is defined in the Puerto Rico Insurance Code as follows:

**Sec. 1105. Insurable interest, property and interests**

(1) No insurance contract on property or any interest therein or arising therefrom shall be legally enforceable as to the insurance except for the benefit of persons having an insurable interest in the things assured.

(2) "Insurable interest" as used in this section means any actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction or pecuniary damage or impairment.

(3) the measure of an insurable interest and property is the extent to which the insured might be damnified by loss, injury or impairment thereof.

P.R.Laws Ann. tit. 26, § 1105 (1976).

Plaintiff argues that NAVIERAS had no insurable interest in the "paid and reserved losses part of the retrospective rating plan premium" since those losses were paid by TRAVELERS pursuant to the terms of the underlying Travelers policy and not by NAVIERAS. Additionally, OCASO contends that since its insurance obligation arose from an indemnity provision, it was only required to reimburse NAVIERAS for sums actually expended by the insured. Thus, if payment was made by TRAVELERS rather than NAVIERAS, there was no obligation to refund the insured.

Even assuming that OCASO's method of computing damages and for establishing its obligations under the policy is correct,[2] we

---

**2.** NAVIERAS has submitted evidence pointing to a different formula for ascertaining the amount of damages chargeable to OCASO. *See* NAVIER-

AS' Response ... (docket No. 125) and Motion to Strike ... (docket No. 126).

find that plaintiff is precluded from advancing arguments which have no basis in the allegations set forth in the complaint.

The thrust of the claims asserted in the pleading is that defendants **omitted crucial information to the risk** being undertaken. Plaintiff charges that inadequate information as to the risk and history of previous losses for NAVIERAS was provided.

In this regard, the pertinent paragraph of the complaint from which essentially all claims originate reads:

18. Notwithstanding the repeated requests by Ocaso, defendant Hick, acting through Overseas Reinsurance on behalf of Financial Guardian, World American and Worldsurance, together with defendant Wining, President of World American, represented to Ocaso through Griffiths that the initial offer of reinsurance was not as good a risk and that the history of losses at PRMSA was excellent. The information provided to Ocaso was incomplete and misleading, inasmuch as it failed to mention, *inter alia*, the extent of claims and losses incurred by PRMSA and PRMMI originating under the Worker's Compensation and Employers' Liability laws and regulations, the dimension of PRMSA's and PRMMI's potential exposure thereunder, and misled Ocaso by failing to indicate that PRMSA and PRMMI were undertaking to enter into an additional operation, thereby increasing their potential for adverse losses. As such, the information provided by the defendants herein to Ocaso was incomplete and failed to depict and (sic) accurate picture of the risks involved.

Thus, all seven (7) claims asserted by plaintiff arise from the same core conduct charged in ¶ 18 of the complaint. Plaintiff charges defendants (1) knowingly failed to provide accurate and complete loss history information to induce OCASO to issue a policy it would not have otherwise issued (FIRST CAUSE OF ACTION—misrepre-

sentation/fraud ¶¶ 25–28); (2) violated its duty to provide accurate and complete information regarding the risk being undertaken (SECOND CAUSE OF ACTION—prima facie tort ¶¶ 29–31); (3) fraudulent misrepresentations and omission to induce issuance of policy (THIRD CAUSE OF ACTION—common law fraud ¶¶ 32–34); (4) made misrepresentations which were material to the risk (FOURTH CAUSE OF ACTION—P.R. Insurance Code 26 L.P.R.A. 1110 ¶¶ 35–39); (5) defendants unjustly enriched themselves to the detriment of OCASO (FIFTH CAUSE OF ACTION—unjust enrichment ¶¶ 40–43); (6) defendants acted in concert to fraudulently induce OCASO to issue the policy (SIXTH CAUSE OF ACTION—conspiracy ¶¶ 44–46); and (7) carried out the fraudulent scheme utilizing wire and mail (SEVENTH CAUSE OF ACTION—RICO ¶¶ 47–53).

The potential exposure of the defendants in a litigation is controlled by the allegations set forth in the initial pleading.[3] Fairness dictates that defendants be given a minimum degree of forewarning as to the underlying basis for the relief sought. Thus, even though the Court will liberally construe the substance of the information provided in the complaint and in particular situations may not require that the specific legal theory be identified, at least some notion of the grounds justifying the remedies sought in the proceedings must appear. "Although the liberal pleading policy embodied in Rule 8 does not require a party to specify its legal theory of recovery, the pleadings must at least implicate the relevant legal issues." *Schott Motorcycle Supply v. Am. Honda Motor Co.*, 976 F.2d 58, 62 (1st Cir.1992) (quoting 5 Wright & Miller, Federal Practice and Procedure, § 1286, at 558 (2nd ed. 1990) cf. *Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.* 838 F.2d 612, 622 (1st Cir.1988) (complaint that alleges basic facts underlying claim need not explicitly identify proper legal theory).

---

3. In pertinent part, Rule 8 Fed.R.Civ.P. reads:

**Rule 8. General Rules of Pleading**

. . . .

**(e) Pleading to be concise and Direct; Consistency.**

**(1)** Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required.

. . . .

**(f) Construction of Pleadings.** All pleadings shall be so construed as to do substantial justice.

██ After a careful examination of all claims asserted in the complaint as well as the extensive underlying facts described in the pleading, we find that no notice to defendants may be inferred therein regarding either the alleged lack of insurable interest or absence of losses to the insured as grounds for voiding the policy. All seven claims and facts asserted in the complaint deal exclusively with defendants' purported fraudulent failure to adequately disclose the extent of the risk for the New Jersey operations without any minimal suggestion of the claims raised by plaintiff in its partial summary judgment request.

> [T]he liberal construction accorded a pleading under Rule 8(f) does not require the courts to fabricate a claim that a plaintiff has not spelled out in his pleadings, and it does not permit the pleader to weave a net of refinements and technicalities in which to catch an unwary litigant.

5 Wright & Miller, Federal Practice and Procedure: Civil 2d § 1286 at 559 (footnotes omitted) (1990).

Therefore, plaintiff's claim that the contract is invalid in that NAVIERAS had no insurable interest in the policy issued by OCASO nor that it sustained an insurable loss does not appear in the complaint and thus, its Motion for Partial Summary Judgment (docket No. 113) must be **DENIED**.

## II. *MOTION FOR SUMMARY JUDGMENT FILED BY NAVIERAS*

### *—WAIVER AND NO MISREPRESENTATION—*

NAVIERAS has moved for summary judgment alleging that OCASO waived any potential suit against it arising from the insurance policy at issue in this litigation. Further, it argues that plaintiff has failed to state a colorable claim based on misrepresentation.

### A. WAIVER

NAVIERAS alleges that OCASO waived any claims it may have against it regarding the policy at issue in these proceedings based on the contents of a transmittal letter subscribed by JOSE LUIS BELLO and formal correspondence from OCASO which were sent together with the first payment. In the purported waiver, in pertinent part, BELLO advises of a separate "formal" correspondence included therewith which he had signed "as representative for OCASO" and which had been prepared by counsel for OCASO in order to preserve the insured's rights against third parties but **not** including NAVIERAS.

However, the "formal" correspondence clearly indicates that payment was being made "under protest" with "full reservation of rights ... to commence legal proceedings to seek the return of said payment should our investigation reveal such action is warranted" without any reference to the exclusion of NAVIERAS.

██ Waiver of claims must be strictly construed and will be interpreted against the party seeking to benefit from such waiver. Further, the party's intention must appear explicitly and unequivocally in the document. *Chico v. Editorial Ponce, Inc.,* 101 D.P.R. 759 (1973). Additionally, the thrust of the complaint is based on the purported misrepresentation and fraudulent conduct of the defendants and thus liability based on fraud may not be relinquished. Waivers to such effect are considered null. *See* 31 L.P.R.A. § 3019 (1990).

██ We, therefore, deny NAVIERAS' argument regarding the waiver.

### B. MISREPRESENTATION

Movants deny plaintiff's claims that NAVIERAS through its agents, misrepresented the extent of the risk being undertaken and that no adequate disclosure was made regarding the pertinent loss history for OCASO to adequately consider the risk involved upon issuing the policy. Additionally, they contend that NAVIERAS is not liable for any misrepresentations made by HICK during the course of the negotiations.

The insurance sought from OCASO covered NAVIERAS' taking over stevedoring operations at port Elizabeth, New Jersey. OCASO was provided the insured's loss history for the work carried out in Puerto Rico.

Plaintiff contends it was not alerted to the fact that NAVIERAS' exposure in New Jersey was more extensive due to the applicability of the USLHWCA nor was it informed that UNITED TERMINALS, the previous operator, had refused to supply the pertinent loss information.

## 1. Agency

NAVIERAS raises the issue of agency and question its purported liability for what may have been HICK's alleged acts or omissions. However, while HICK was procuring insurance for NAVIERAS he was acting as the insured's broker and considered its agent.

> The broker is usually regarded as the agent of the insured despite the fact that the broker is the agent of the insurer for delivery of the policy and transmittal of the premium to the insurer and the fact that the broker receives his compensation from the insurer.

3 Couch Cyclopedia of Insurance Law § 25.93 at p. 444 (2d Ed.1984)

■ If a broker is an agent for the insured, the insurer may void the policy for withholding material information concerning the history of claims. Long.R., 3 The Law of Liability Insurance, § 19.04[2] p. 199–34 (Matthew Bender 1994)

> Where the broker is the agent of the insured to procure the policy, concealment by him of material facts avoids the policy.

9 Couch § 38.10 at 378

■ However, as discussed below, it appears that an issue of material fact exists as to whether or not there was a misrepresentation regarding the risk being undertaken and whether or not adequate disclosure regarding the losses was made. Consequently, HICK's agency status is immaterial at this time, e.g., if HICK was acting as a broker procuring insurance for NAVIERAS his acts or omissions in this regard are imputed to the insured. If, on the other hand, HICK was plaintiff's agent during the period the agreement was being developed, any misrepresentations made to him by NAVIERAS would bring about the same result as if made directly to OCASO.

## 2. Misrepresentation/Omissions

Defendants argue that any lack of information pertaining to the additional liability in New Jersey was due to GRIFFITH's own failure to adequately inquire as to information relevant to its decision to issue the policy. Plaintiff, on the other hand, alleges that it was the insured's duty, through its agents, to provide information material to the risk being undertaken which information was purposely concealed and misrepresented. Plaintiff claims that the loss experience submitted for NAVIERAS was misleading because it was limited to the Puerto Rico activity whereas the new operations entailed greater exposure since they were covered by the USLHWCA. Additionally, OCASO argues that defendants should have disclosed that UNITED TERMINALS had refused to provide the pertinent information for said operations.

■ A material misrepresentation or omission may cause the policy to be rescinded. *See* Ostrager B. and Newman T. Handbook on Insurance Coverage Disputes § 3.01[a] p. 76 (7th Ed.1994) and failure to disclose material information constitutes a misrepresentation which may void the policy.

> If a party fails to disclose a fact that a reasonable insured would have believed was something the insurer would consider material, the insurer is entitled to rescind the policy.

*Id.* at § 3.01[b] p. 77.

This same principle applies in reinsurance situations.

> It is well settled that where a reinsurer is induced to enter into a contract of reinsurance by reason of the reinsured's failure to disclose the material facts pertaining to the risk, the agreement is voidable.

*Id.* at § 16.03[a] p. 677.

■ Materiality is determined by information which affects the decision of the insurer to issue a policy either to the determination of the premium to be charged or for the evaluation of the risk.

> [A] fact that has been misstated or omitted is deemed "material" if it could reasonably be considered as affecting the insurer's decision to enter into the contract, or its

evaluation of the degree or character of the risk, or its calculation of the premium to be charged.

*Id.* at § 3.01[d] p. 78–79. *See also* 9 Couch § 38.27 at 395–397.

■■■ The situation before us, however, requires that the precise circumstances of the events leading to the issuance of the policy by OCASO be developed at a trial. Issues of material fact exist regarding the misrepresentation issue. Conflicting versions on the scope and adequacy of the information supplied and whether or not additional disclosure was warranted in this case must be addressed to the jury.

It is a question of fact for determination by the jury whether the circumstances are such that silence constitutes concealment. And whether or not inquiry was made is for the jury where the evidence is conflicting, as is the question whether disclosures were full and truthful.

9 Couch § 38.12 at 378–9.

## C. CONCLUSION

Based on the foregoing, the Motion for Summary Judgment filed by NAVIERAS (docket No. 117) is **DENIED.** The waiver by OCASO is not binding under the circumstances of this case. Additionally, issues of material fact are present regarding misrepresentation and the failure to disclose allegations.

### III. *MOTION FOR SUMMARY JUDGMENT FILED BY WINING, FGI, WAUI AND WORLDSURANCE*

### —*STATUTE OF LIMITATIONS AND FAILURE TO STATE CLAIM*—

Codefendants JAMES R. WINING, in his personal capacity, FINANCIAL GUARDIAN, INC., WORLD AMERICAN UNDERWRITERS, INC. and WORLDSURANCE, INC. have moved for dismissal of the complaint alleging that it is time-barred and that it fails to state a colorable claim against them.

■■■ Even though neither NAVIERAS nor OVERSEAS filed dispositive motions on these issues, we shall make our summary judgment ruling applicable to them. Not only were these matters raised as affirmative defenses by these parties [4] but foremost, the underlying relevant facts to our decision are common to all defendants in this action. Lastly, plaintiff was afforded an opportunity to address arguments in this regard in response to movants' petition.

According to petitioners, the FIRST, SECOND and THIRD causes of action are time-barred pursuant to Laws of P.R.Ann., tit. 31 § 5298 (1991) which provides that actions sounding in negligence must be instituted within one (1) year "from the time the aggrieved person had knowledge thereof." (1991). This term will commence to run "from the day on which they [claims] could have been instituted." § 5299

Plaintiff, on the other hand, contends that the claims are not time-barred arguing that defendants' obligation is contractual arising from a brokerage contract ("contrato de corretaje") which term may be either three (3) or fifteen (15) years.[5]

However, nowhere in the entire pleading do we find any reference to either the alleged brokerage contract or any claim arising from violations of such a contract. Therefore, consonant with our previous discussion on the notice limitations imposed by the parameters of Rule 8 Fed.R.Civ.P., we find that no claim has been asserted in the complaint against codefendants for breach of a brokerage contract and this argument must be rejected.

We shall proceed to identify the nature of the actions set forth in the complaint in order to properly analyze whether or not they are timely and if they present a colorable cause of action.

---

**4.** *See* Answer to the Complaint filed by NAVIERAS on October 2, 1986 (docket No. 18) and Answer to the Complaint filed by OVERSEAS on October 22, 1986 (docket No. 23).

**5.** According to plaintiff, the brokerage contract can be either civil or mercantile. If civil, the applicable term for instituting actions is set at 15 (fifteen) years under Laws of P.R.Ann., tit. 31 § 5294 (1991) (breach of contract) and three (3) years for broker's liability under the Puerto Rico Commerce Code Laws of P.R.Ann., tit. 10 App. I § 1904 (1976). *See* docket No. 128 at 24.

## A. FIRST CAUSE OF ACTION

### 1. *Nullity of Contract*

#### a. Dolo *in contrahendo*

The FIRST CAUSE OF ACTION charges defendants with having "fraudulently misrepresented" to OCASO the nature and extent of the insurance risk being undertaken and contends that "[s]uch misrepresentations and omissions constitute fraud in the formation of the contract (*"culpa in contraendo* (sic)")" which rendered the insurance contract null and void. Complaint ¶ 9.

In essence, this claim asserts the nullity of the insurance contract based on the alleged serious misrepresentations of the risk during the course of the negotiations. Wrongful representations or omissions which affect the consent of a contracting party are also known as "dolo *in contrahendo*" I Luis Diez–Picaso, Fundamentos del Derecho Civil Patrimonial 170 (4th ed. 1993).

■■■■ "Dolo *in contrahendo*" may render a contract null if the nature of the misrepresentations is such that it is concluded that it affected the freedom of consent of one of the contracting parties.[6] The Puerto Rico Civil Code provides that no valid contract exists unless there is the (1) consent of the parties; (2) an object of the contract and (3) cause for the obligation. P.R.Laws Ann., tit 31 § 3391 (1991). "Consent given by . . . deceit shall be void." P.R.Laws Ann., tit 31 § 3404 (1991). Deceit takes place "when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made." P.R.Laws Ann., tit. 31 § 3408 (1991). Deceit of a "serious" nature will render the contract null whereas "incidental deceit" will merely cause indemnification of the damages incurred. P.R.Laws Ann., tit. 31 § 3409 (1991).

#### b. Limitations Period

■■■ Contrary to those agreements which may be ratified,[7] a contract which lacks the necessary consent due to "dolo" is null *ab initio*, i.e., from its inception and therefore, the statute of limitations does not affect it. I Luis Diez Picaso, Fundamentos del Derecho Civil Patrimonial 448; II Alberto Blanco, Curso de Obligaciones y Contratos 306 (3d ed. 1980).

■■■ Thus, a suit requesting that a void contract be annulled may not be subject to a limitations period.[8]

#### c. Relief Available

■■■ In situations where a contract is declared null based on a party's consent being ineffectual due to deceit, the relief afforded under P.R.Laws Ann., tit. 31 § 3514 (1991) is specifically limited to each party returning the monies exchanged between them with interest. Upon declaring a contract null, "the contracting parties shall restore to each other the things which have been the object of the contract with their fruits, and the value with its interest". Laws of P.R.Ann., tit. § 3514 (1991). Given the particularized and narrow remedy provided by the statute, it is reasonable to conclude that **only parties** to the contract may be sued under this provision because they are the only ones which may comply with the statutory mandate of "restor[ing] to each other the things which have been the object of the contract with their fruits, and the value with its interest". Laws of P.R.Ann., tit. 31 § 3514 (1991).

### 2. *Additional Relief*

In addition to reimbursement of the $1 million paid under the policy, plaintiff is seeking alleged damages in the sum of $500,-000.00 from all defendants. Since the relief

---

**6.** "Dolo" induced by an employee or representative of a contracting party falls within the provisions of P.R.Laws Ann., tit. 31 § 3408 (1991). I Luis Diez–Picaso, Fundamentos del Derecho Civil Patrimonial 175; IV–II José Ramón Vélez Torres, Curso de Derecho Civil 59 (1990).

**7.** For a distinction between those contracts that are "null" as opposed to "annullable" *see* II

Alberto Blanco, Curso de Obligaciones y Contratos 304.

**8.** Resolution, rescission and nullity of a contract are different concepts with varying legal implications. *See* II Alberto Blanco, Curso de Obligaciones y Contratos 331–333.

available for actions to void contracts for lack of adequate consent is limited to those specifically identified in § 3514, any request for relief above and beyond declaring the contract null and returning $1 million with interest accrued must arise from a separate legal or contractual obligation. II Alberto Blanco, Curso de Obligaciones y Contratos 144–145; 320–324. Therefore, plaintiff's claims for damages arising from for conduct related to "dolo *in contrahendo*", either against the contracting parties or non-parties to the agreement must be premised on a separate legal provision. *Id.* at 320–24.

Thus, we shall examine the allegations in the FIRST CAUSE OF ACTION to determine the source of the claim for damages to determine (1) if a viable cause of action has been plead and (2) if so, whether it is timely.

#### a. Contract v. Tort

In order to determine whether a claim for damages based on conduct related to "culpa *in contrahendo* " is contractual or tortious [9] we must begin by ascertaining whether defendants' conduct breached an obligation imposed by contract or law or if it violated a general principle of conduct which permeates all relationships, i.e., to act in good faith. *See* I Herminio M. Brau del Toro, Los Daños y Perjuicios Extracontractuales en P.R. 42–43 (2d ed. 1986).

■■■■ All actions which result in injuries arise from two categories of conduct: (1) the failure to abide by a pact or (2) an activity separate from any previous legal relationship between the wrongdoer and the victim. Ricardo de Angel Yágüez, La Responsabilidad Civil 21 (1988). In the first instance, the duty to indemnify arises from another duty, the duty to comply with obligations engendered by a contract which has been infringed upon, that is, a contractual responsibility. *Id.* at 22. In the second scenario, the obligation to indemnify arises by the mere fact of having caused damages be-

cause the wrongdoer has infringed upon the general norms of respect towards others imposed by society, i.e. civil responsibility. *Id.*

■■■■ In contract infringement cases a previously existing relationship between the parties is present whereas in torts, the duty to plaintiff commences at the time of the injury. Jaime Santos–Briz, Derecho de Daños 13–14 (1963).

■■■■ Consonant with this line of reasoning, we conclude that the conduct charged in the FIRST CAUSE OF ACTION of the complaint must fall within the torts ambit since any liability arising from the alleged misrepresentation is not premised on any contractual obligations—the contract had not yet materialized—but on a general obligation to negotiate in good faith. IV–II José Ramón Vélez Torres, Curso de Derecho Civil 61–67. The obligation to negotiate in good faith is based on a general duty pervading in society whereas objective responsibility is limited to those situations expressly identified in a statute. *Id.* at 64–65.

Therefore, the $500,000 requested as additional relief is not contemplated within the contractual framework and is necessarily based on Art. 1802 of the Civil Code, P.R.Laws Ann., tit. 31 § 5141 (1991) for damages resulting from negligent acts or omissions.

#### b. Statute of Limitations—Accrual

■■■■ The applicable statute of limitations to the claim for damages asserted in the FIRST CAUSE OF ACTION is one (1) year as provided for actions sounding in tort as set forth in P.R.Laws Ann., tit. 31 § 5298 (1991). We must now resolve whether this action was timely filed.

Plaintiff alleges that even assuming the claim asserted against co-defendants is premised in tort, the claim did not accrue until OCASO had paid all exposure IN FULL

---

**9.** The nature of the claim against a contracting party for "dolo *in contrahendo*" has been the subject of considerable debate among the commentators. It appears, however, that the conclusion that an obligation resulting from *"culpa in contrahendo"* is contractual in nature is premised on specific provisions of the Spanish Civil Code—which have no counterpart in Puerto

Rico—which dictate particular conduct in the pre-contract stage, i.e., during the course of the negotiations. Thus, infringement in such a case presupposes the existence of an obligation arising from law, that is, a statutory duty which is precisely the key element for a contractual obligation. *See* Adriano de Cupis, El Daño, 165–171 (Angel Martínez Sarrión trans., 2d ed. 1975).

because it was at that time that it suffered harm and therefore, it could not have sued at an earlier date.

 The statute of limitations will begin to run when plaintiff becomes aware of the damage and the person who caused it. *Santiago Hodge v. Parke Davis & Co.*, 909 F.2d 628, 632–33 (1st Cir.1990). In cases of fraud the statute of limitations will commence to run not from the date of the fraud but from the time when the fraud was discovered or when, "with reasonable diligence might have been discovered." *Garcia v. Bernabe*, 289 F.2d 690, 692 (1st Cir.1961). Plaintiff must be diligent in this regard. A claimant may not benefit from additional time if the failure to discover the underlying claim is due to its own carelessness.

> While this theory of damages establishes that the one-year statute of limitations commences on the date plaintiff becomes aware of the damage and who caused it, if the plaintiff's lack of awareness is due to its own negligence or carelessness, then the prescriptive period will begin to run on the date the alleged tort occurred. A victim is presumed to have knowledge of the injury at the time of the tortious act, and the victim has the burden of proving that he learned of the act at a later date.

*Barretto Peat, Inc. v. Luis Ayala Colon Sucrs.*, 896 F.2d 656, 658 (1st Cir.1990). *See also Colón Prieto v. Géigel*, 115 D.P.R. 232, 244 (1984) (plaintiff may not complain if ignorance due to own negligence); *Rivera Encarnación v. E.L.A.*, 113 D.P.R. 383, 385 (1982) (accrual when damages and cause known; it is claimant's burden to establish when became aware of the injury and its cause).

 Payment of $479,365.00 for the initial claim submitted on behalf of NAVIERAS was made in **October 1983** after OCASO had had ample opportunity to investigate all information relevant to the risk. A meeting regarding delay in payment of the outstanding claim was held at MR. GRIFFITHS' Florida office on **September 30, 1983**. MESSRS. GUEVARA, HALL, BYRON and CRIST attended. Although MR. GRIFFITHS claimed he had not been properly

advised of the USLHWCA exposure at New Jersey, during the course of that meeting it was confirmed that MR. GRIFFITHS had available in his file the documentation regarding the retrospective rating plan and the loss run of the TRAVELERS for the term October 1, 1978 to October 1, 1982. *See* CRIST Depo. at 45–46 Additionally, this voluminous document was also discussed and reviewed by MR. BYRON who eventually recommended payment. CRIST depo. at 47.

According to the testimony provided by MR. GRIFFITHS in his deposition, he sent MR. BYRON, his employee, to New York in **October 1993** to meet with MR. CRIST to investigate the insured losses on behalf of OCASO. GRIFFITHS' depo. at 32–34 According to MR. GRIFFITHS, "Byron was a very experienced insurance person". *Id.* at 38.

On **October 20, 1983** MR. GRIFFITHS forwarded a telex to GUEVARA/PRMSA which indicated that OCASO was satisfied with the results of the investigation and payment would be forthcoming. In pertinent part, it reads:

> R. Byron has now returned from New York where he reviewed details with Jim Crist to our satisfaction.

> We (sic) preparing draft in settlement, which will deliver against suitable discharge.

Motion for Summary Judgment … (docket No. 118) Exh. H. *See also* GRIFFITHS' depo. at 34–35.

Payment of $479,365.00 was subsequently made in **October 1983**. Although MR. GRIFFITHS initially submitted a release for additional claims as part of this payment, the monies were subsequently delivered without reservation through letter dated **October 25, 1983** and a check issued on **October 28, 1983**. GUEVARA depo. at 84–89.

It is important to note that throughout the aforementioned investigative process OCASO was concerned with the inexplicable increase in losses which prompted the request for both an audit and additional documentation.[10]

---

10. During this period OCASO requested ample documentation and information. *See* i.e., letter

from GRIFFITHS to WINING dated August 16,

As early as **August 9, 1983** the following telex sent by MR. GRIFFITHS to MR. WINING revealed his concern.

> In view of severity of the deterioration of the outstanding claims, we may wish to audit Travellers [sic] claims files. Please advise us who we may get in touch with in this connection so that our actuary may be provided with the appropriate information.

Motion for Summary Judgment . . . (docket No. 118) Exh. Y.

OCASO was visibly concerned with the increase in losses. In a letter to MR. WINING dated **August 16, 1983**, MR. GRIFFITHS indicted as follows:

> As presented at time of Binding (August 1981) and now at time of loss we see the following:
>
> Experience 10/1/1978—81 Total $434,186
>
> At date of adjustment this number has apparently climbed to $881,518. In addition, 10/1/1981—82 is reported at a further $844,140. We have difficulty in understanding the **significant worsening**.

Motion for Summary Judgment . . . (docket No. 118) Exh. Z.

Fraud pertaining to the loss history was a distinct consideration from the initial stages of the evaluation of the claim submitted as stated in a letter from MR. WINING to MR. HALL dated **August 17, 1983** and copied to MR. GRIFFITHS. In the process of itemizing information required to finalize the claim MR. WINNING inquired:

> 7. Has there been a **fraudulent act somewhere or a misrepresentation of experience** by TIC or is this a normal course of events?

Motion for Summary Judgment . . . (docket No. 118) Exh. CC (emphasis ours).

Based on the foregoing, we find that at least by the time payment of the first claim was made in **October 1983** OCASO had sufficient information at hand to discover any alleged misrepresentations regarding the risk. The tone of the correspondence exchanged clearly evinces the possibility of a misrepresentation of the risk which would have certainly been the prime concern in the audit conducted by MR. BYRON on plaintiff's behalf. Additionally, the sums initially claimed represented a substantial portion of the insurance coverage monies. The Declaration of Insurance for Retrospective Rating Plan Loss Indemnity Certificate was issued by OCASO on **October 1, 1981** for an aggregate indemnity of **$1 million**. The plan covered the retrospective rating term from **October 1, 1978 to October 1, 1982**. After scarcely **one year**, close to 50% of the total coverage was being demanded; another three years of exposure still remained for the balance of **$1 million**.

We find therefore, that for purposes of accrual, during the course of the first investigation which concluded in payment of $479,-365.00 in **October 1983** OCASO "with reasonable diligence might have . . . discovered" the alleged misrepresentations regarding the risk. Based on the totality of the circumstances surrounding the first payment it is clear that if OCASO had, indeed, failed to ascertain the alleged "misrepresentation" during this time it was due exclusively to its own negligence and not to any conduct on the part of the defendants.

Furthermore, during the course of approving payment of the outstanding balance under the policy, OCASO carried out an additional investigation through MR. BELLO which provided still another opportunity to detect the purported fraud. Again, the atmosphere was one of distrust. In a telex dated **September 11, 1984** from MR. BYRON to MR. VERLEN a visible concern for the losses and possibility of misrepresentation is quite apparent in the following paragraph.

> When you send papers please let us have a full explanation of events leading to drastic and rapid deterioration of experience. **The very fact that PRMSA bought this coverage after a history of no penalties, then immediate deterioration suggests at least a possibility that there was knowledge of a change in condition that was not revealed to the underwriter.** We insist on a full written explanation of circumstances prior to our taking action on your cash call.

1983. Motion for Summary Judgment . . . (docket No. 118) Exh. Z.

Motion for Summary Judgment ... (docket No. 118) Exh. DD (emphasis ours).

This notion was reiterated in a **November 9, 1984** telex from MR. GRIFFITHS to MR. VERLEN which reads, in pertinent part:

> As mentioned in the 9/11/84 telex, we still suspect **misrepresentation** or a change of condition not brought to our attention at time of placement.

Motion for Summary Judgment ... (docket No. 118) Exh. EE (emphasis ours).

Prior to approving this second payment, officers selected by OCASO's Board of Directors in Spain directly intervened in the matter; extensive documentation was requested from NAVIERAS and MR. BELLO conducted an in-depth investigation of the losses. Finally, at a meeting held on **March 25, 1985** MR. BELLO met with representatives of NAVIERAS to discuss his findings and payment terms. It was also agreed that payment of the final amounts due would be effected in two (2) installments.

Therefore, plaintiff had available yet a second opportunity to discover with reasonable diligence the alleged misrepresentations regarding the risk—which misrepresentations dated back to the latter part of **1981** during the insurance contract negotiations. Thus, even assuming that OCASO could not have diligently detected the purported fraud during MR. GRIFFITHS' tenure, we find that by **March 1985** when the second investigation had already concluded and payment approved by OCASO, plaintiff was certainly in a position to ascertain the misinformation concerning the risk under the policy.

We also find that OCASO has not met its burden of showing when the claim accrued. *See Rivera Encarnación v. E.L.A., supra.* Plaintiff has failed to justify its inordinate delay in discovering the purported fraudulent misrepresentations particularly in light of the suggestions of fraud which consistently appear in the correspondence surrounding both investigations in response to the claims made on behalf of NAVIERAS. Instead, OCASO

argues that it could not have instituted suit until *after payment of* **all** *monies under the* policy had been effected because prior to that, it had no actionable injuries. We find this reasoning without merit. As of **October 1993** not only had plaintiff already sustained considerable losses based on exactly the same misrepresentation charged in the complaint but it still faced a substantial potential exposure for the remaining $1 million under the policy.[11]

Inasmuch as the complaint in this case was filed on **April 25, 1986** the claims sounding in tort set forth in the FIRST CAUSE OF ACTION are time-barred.

### 3. *Conclusion*

■ Except for PRMSA/PRMMI, plaintiff has no cause of action against the other codefendants under Laws of P.R.Ann., tit. 31 § 3514 since they are not parties to the insurance agreement.

■ Further, the claim for damages asserted in the FIRST CAUSE OF ACTION is one sounding in tort and is time-barred in accordance with Laws of P.R.Ann., tit. 31 § 5298.

### B. SECOND CAUSE OF ACTION— PRIMA FACIE TORT

■ According to the complaint, defendants' alleged course of conduct "constitutes a *prima facie* tort". Based on the aforementioned arguments regarding plaintiff's opportunity to learn all possible relevant information regarding the purported "misrepresentations" by 1983 at most,[12] we conclude that an action for a *prima facie* tort filed in 1986 is untimely under Laws of P.R.Ann., tit. 31 § 5298 (1991).

Therefore, the SECOND CAUSE OF ACTION is time-barred.

### C. THIRD CAUSE OF ACTION— COMMON LAW FRAUD

■ OCASO alleges that the misrepresentations and omissions by the defendants

---

**11.** The first installment on the outstanding balance was issued on **April 2, 1985** which, by itself, prove untimely.

**12.** Otherwise, by late **March 1985** when the second investigation had concluded or even as late as early **April 1985** when the first installment of the outstanding balance was paid which, by themselves, would also prove untimely.

constitute "common law fraud".[13] Suits based on misrepresentation and nondisclosure are premised on negligence. Prosser and Keeton on the Law of Torts § 33 at 205–207 and § 106 at 736–737 (5th ed. 1984).

Accordingly, the THIRD CAUSE OF ACTION is time barred based on the one-year limitations period applicable to tort suits in Puerto Rico, Laws of P.R.Ann., tit. 31 § 5298 (1991), in accordance with the arguments previously discussed.

### D. FOURTH CAUSE OF ACTION— ART. 11.100 OF INS. CODE

Plaintiff asserts a cause of action under Article 11.100 of the Puerto Rico Insurance Code, P.R.Laws Ann., tit. 26 § 1110 (1976) which proves that "[m]isrepresentations, omissions, concealment of facts, and incorrect statements" will prevent coverage under a policy if (1) fraudulent or (2) material to the risk or (3) the insurer would not have issued the policy if had known the true information and the "actions or omissions contributed to the loss that gave rise to the action."

■ Misrepresentations in insurance applications will render the policy void if material to the risk. *Zogbe v. SMA Life Assurance Co.*, 837 F.Supp. 471 (D.P.R.1993); *Hayman v. All Am. Life and Casualty Co.*, 393 F.Supp. 596 (D.P.R.1975).

■ The Civil Code provisions will be utilized to resolve matters not directly covered by the Insurance Code. *U.S. Fire Ins. Co. v. Producciones Padosa, Inc.*, 835 F.2d 950, 954 (1st Cir.1987). *See also Casanova Diaz v. Puerto Rican–American Ins. Co.*, 106 D.P.R. 689 (1978) and *Sandoval v. Puerto Rico Life Ins. Co.*, 99 D.P.R. 287 (1970).

Utilizing the Civil Code principles regarding voidance of contracts, if the insurance policy is declared null due to misrepresentations regarding a material risk the only legal effect is for OCASO to return the premiums paid and NAVIERAS to return the $1 million erroneously paid with interest accrued. *See* Laws of P.R.Ann., tit. 31 § 3514 (1991).

■ Applying the same arguments previously discussed regarding the FIRST CAUSE OF ACTION we hereby conclude that (1) the only relief available under art. 11.100 is voidance of the insurance contract without any provision for damages and (2) that only parties to the contract may be sued.

■ Accordingly, except for PRMSA/ PRMMI, plaintiff has no viable claim against the other codefendants under art. 11.100 since they are non-parties to the insurance contract.

### E. FIFTH CAUSE OF ACTION— UNJUST ENRICHMENT

■ The FIFTH CAUSE OF ACTION is based on the "unjust enrichment" theory pursuant to Laws of P.R.Ann., tit. 31 § 5091 (1991). Plaintiff alleges that:

41. As a result of the previously described conduct of the herein named defendants, Ocaso granted an insurance coverage it would not have granted otherwise and paid under protest the $1,000.000.00 claimed under such cover. Had Ocaso not paid the claims filed, defendants PRMSA and PRMMI would have been forced to pay such losses themselves. Accordingly, defendants, Wining, PRMSA and PRMMI were unjustly enriched to the detriment of Ocaso. In addition, all other defendants received commissions or payments for participating as co-producers or co-brokers in the process leading to Ocaso's granting of the insurance coverage in question. The failure of such defendants to disclose an accurate history of the insured's history of loss information ultimately resulted in Oca-

---

**13.** It should also be noted that jurisdiction for this claim having been raised under 28 U.S.C. § 1332 (the diversity statute), the substantive law of Puerto Rico applies. *See Mottolo v. Fireman's Fund Ins. Co.*, 43 F.3d 723 n. 2 at 726 (1st Cir.1995); *Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd.*, 41 F.3d 764, 772 (1st Cir. 1994). The Puerto Rico Supreme Court has specifically held that actions sounding in tort are governed by civil law precepts. *See Valle v.*

*Amer. Inter. Ins. Co.*, 108 D.P.R. 692, 696–7 (1979) (rejecting application of common law principles to resolve civil law situations); *Gierbolini v. Employers Fire Ins. Co.*, 104 D.P.R. 853, 855 (unless otherwise disposed of by legislation, the law of "daños" in Puerto Rico is governed by civil law norms). Therefore, we question the validity of a claim asserted under common law principles to the facts at hand in this case.

so's granting of the coverage they requested. Thus, defendants Financial Guardian, World American, Worldsurance, Hick and Overseas Reinsurance have been unjustly rewarded by their fraudulent conduct.

Complaint at 13–14.

WINING has sought to dismiss the unjust enrichment claim asserted against him in his personal capacity. Plaintiff alleges that WINING's "active participation in the fraudulent scheme resulted in his own personal gain." OCASO's Opposition . . . (docket No. 128) at 32. As grounds for this assertion it is alleged that "[t]o the extent that his fraudulent efforts produced more business and increased his employer's earnings, his participation was rewarded by greater pecuniary rewards within the corporate structure." *Id.* However, there is no evidence in the record to support this allegation which we conclude is totally speculative.

 We further find that this claim is subject to dismissal based on separate grounds. Unjust enrichment is a doctrine based in equity which seeks to do justice in the absence of a contractual or legal obligation, *Umpierre v. Torres Díaz,* 114 D.P.R. 446 (1983) and its purpose is to avoid the inequity of a person unjustly enriching himself at the expense of another. *Silva v. Comisión Industrial,* 91 D.P.R. 891 (1965). However, claims for unjust enrichment are "subsidiary in nature and will only be available in situations where there is no available action to seek relief." *Medina & Medina v. Country Pride Foods Ltd.,* 631 F.Supp. 293, 302 (D.P.R.1986) aff'd. 901 F.2d 181 (1st Cir. 1990). *See also El Toro Electric Corp. v. Zayas,* 106 D.P.R. 98 (1977).

Defendants' allegedly fraudulent conduct would allow for a claim sounding in tort under art. 1802 of the P.R. Civil Code, Laws of P.R.Ann., tit. 31 § 5141 (1991) [14] for which reason we find that equitable principles are inappropriate in this instance.[15]

Accordingly, we find that plaintiff has failed to state a claim for unjust enrichment.

---

**14.** *See* Discussion regarding FIRST CAUSE OF ACTION *ante.*

## F. SIXTH CAUSE OF ACTION— CONSPIRACY

 Plaintiff has also asserted a "conspiracy" cause of action as follows:

45. All the herein named defendants were aware that their request for the insurance coverage made to Ocaso could not be issued by Ocaso. Yet, all defendants conspired and acted in concert in order to influence and convince Griffiths to breach his contractual obligation to plaintiff Ocaso and commit Ocaso to the coverage in question.

Defendants contend that even if a conspiracy claim exists under the Puerto Rico legal principles, it would be an action sounding in tort which is time-barred. In its argument in response thereto plaintiff cites a case which recognizes a cause of action for "conspiracy to commit a tortious act, coupled with a tortious act". OCASO's Opposition . . . (docket No. 128) at 33. Thus, plaintiff seems to concede that the claim is one for tort. We also find that, as previously discussed in the arguments regarding the FIRST CAUSE OF ACTION that any such claim must arise from art. 1802 since no contractual or other legal obligation is cited for the liability.

Again, based on the arguments regarding the untimeliness of the claims arising under art. 1802 previously discussed, we find that any claim for conspiracy would be time-barred under Laws of P.R.Ann., tit. 31 § 5298 (1991).

## IV. *MOTION TO DISMISS FILED BY NAVIERAS, WINING, FGI, WAUI AND WORLDSURANCE*

### —*RICO CLAIM*—

Defendants submitted a Motion to Dismiss Count VII, a claim based on the Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. § 1962 alleging that plaintiff has failed to identify an enterprise separate and apart from the RICO defendant(s)

---

**15.** The fact that the tort action is time-barred is of no significance since plaintiff should not benefit from its own lack of diligence.

and that the complaint further fails to establish a pattern of racketeering activity.

Once again, for the reasons stated earlier, we shall make our ruling on this claim extensive to NAVIERAS and OVERSEAS.

Even though the complaint does not specify which of the subsections of § 1962 is being asserted, a reading of ¶ 49 suggests that the suit is being brought under § 1962(c) [16] which provides that:

> (c) It shall be unlawful for any person ... associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

In order to establish liability under § 1962(c) the complaint must assert "1) conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity." *Libertad v. Welch,* 53 F.3d 428, 441 (1st Cir.1995).

### 1. *Enterprise*

■ Under 18 U.S.C. § 1961(4), an enterprise may be comprised of either legal entities or "associations-in-fact" [comprised of individuals by themselves or together with legal entities working for a common purpose]. *U.S. v. London,* 66 F.3d 1227, 1243 (1st Cir.1995); *Libertad v. Welch,* 53 F.3d at 441; *Aetna Casualty Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1557 (1st Cir.1994) ("to satisfy the "enterprise" element of a RICO substantive violation, a plaintiff may prove either the existence of a legal entity, such as a corporation, or that a group of individuals were associated-in-fact.")

■ The alleged racketeering activity may operate either for the benefit or to the detriment of the enterprise. "The statute does not require that the pattern of racketeering be in furtherance of the enterprise." *Aetna Casualty,* 43 F.3d at 1558.

■ However, the enterprise and the person conducting the affairs of the enterprise cannot be the same inasmuch as one cannot conduct the affairs for oneself under

the statute. *Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.,* 57 F.3d 56, 92 (1st Cir.1995) ("statute requires that the *person* ... engaged in racketeering be distinct from the *enterprise* ... whose activities he or she seeks to conduct through racketeering."); *U.S. v. London,* 66 F.3d at 1244; *Libertad v. Welch,* 53 F.3d at 442 ("the enterprise must be an entity separate from the named defendants who are allegedly engaging in unlawful activity."; *Miranda v. Ponce Federal Bank,* 948 F.2d 41, 44 (1st Cir.1991) ("the same entity cannot do double duty as both the RICO defendant and the RICO enterprise"; *Arzuaga–Collazo v. Oriental Fed. Sav. Bank,* 913 F.2d 5, 6 (1st Cir.1990).

■ Participation in the affairs of the enterprise requires some participation in directing the affairs of the enterprise. Even though no formal position or appointment is necessary, participation in the operation or management of the enterprise is required. *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

■ Further, only the RICO defendant and not the enterprise can be found liable for RICO violations. "The enterprise, even if itself blameworthy, cannot also be answerable as a defendant under section 1962(c)." *Miranda v. Ponce Fed. Bank,* 948 F.2d at 45; *Schofield v. First Commodity Corp.,* 793 F.2d 28, 30 (1st Cir.1986) (section 1962(c) sets the enterprise as an instrument of a person carrying out racketeering activity but "there is not suggestion that the enterprise also may be liable, even if it is a wholly illegitimate operation."

It is not clear from a reading of the complaint which of the defendants to these proceedings plaintiff denounces as responsible for conducting the affairs of the enterprise and which of the defendants compose the enterprise. Throughout COUNT VII [17] plaintiff refers to "defendants" without any distinctions whatsoever. The matter is further obscured by the fact that in the allega-

---

**16.** Plaintiff has not opposed the suggestion in this regard as set forth in defendants' Motion to Dismiss (docket No. 116).

**17.** Plaintiff voluntarily dismissed the claims against codefendant MICHAEL HICK. *See* Partial Judgment filed on March 23, 1987 (docket No. 73).

tions the same fraudulent conduct is collectively attributed to all defendants without any particularized depiction of roles and behavior. Further, relief under RICO is being sought from all defendants without distinction.[18]

Plaintiff's explanation in opposition to the request for dismissal does not shed any light as to the identity of those responsible for conducting the racketeering activity and the enterprise. Relying on the liberal interpretation of the statute, opposed dismissal claiming that it had complied with the separateness requirement by offering the following explanation in its motion which appears just as confusing.

> The complaint alleges that all the named defendants comprised such an enterprise and that enterprise, separate and distinct from the individual defendants, was designed to fraudulently obtain the purported insurance coverage in question.... Only an inflexible reading of this complaint would fail to discern the enterprise, as a separate and distinct association from each of the defendants. To the contrary of the allegation contained in the moving defendants' motion, plaintiffs [sic] have identified an enterprise, of which the defendants were individual parts, as separate from each of the defendants.

Plaintiff's Memorandum of Law in Opposition ... (docket No. 129) at 4–5.

18. The pertinent portions of the complaint have been transcribed for easier reference as follows:

48. During the period in question in 1981 the herein **named defendants** devised and carried out a concerted plan to defraud Ocaso in order to obtain the issuance by Ocaso of its commitment to the insurance coverage in question ... to cover defendants PRMSA and PRMMI. Such scheme was carried out through the repeated and continuous use of the mail and telexes incorporating the false and misleading information furnished by the herein **named defendants** to Ocaso in order to induce Ocaso to accept the insurance coverage requested by them for PRMSA and PRMMI, in violation of 18 USC 1341–1343.

49. By using the mail and interstate wire facilities for the purpose of executing the fraud described herein, **defendants** conducted the affairs of PRMSA, PRMMI, Overseas Reinsurance, Financial Guardian, World American, and World Assurance through a pattern of

## 2. *Pattern*

Liability under RICO requires more than the existence of two predicate acts. "Section 1961(5) concerns only the minimum *number* of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195, 207 (1989). The violations must also be in some way related and be part of a continued criminal activity. These factors are commonly referred to as the "relatedness" and "continuity" requirements.

Relatedness means that the predicate acts bear some common characteristics or relationship between each other rather than being isolated criminal acts. *H.J. Inc.*, 492 U.S. at 239–40, 109 S.Ct. at 2900–01, 106 L.Ed.2d at 208; *Libertad v. Welch*, 53 F.3d 428, 444 (1st Cir.1995); *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 44 (1st Cir. 1991); *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 445 (1st Cir.1990) (part of same fraudulent scheme).

Continuity is required because RICO is specifically designed to address continued criminal conduct and may take one of two forms. Either the conduct, although terminated, lasted through a substantial period of time or it will likely recur in the future. "To establish a RICO pattern it must also be

"racketeering activity" as that term is defined in 18 USC 1961.

50. **Defendants Hick** and **Wining** are "persons" and **defendants PRMSA, PRMMI, Overseas Reinsurance, financial Guardian, World American, and Worldsurance** are "enterprises," as such terms are defined in 18 USC 1961....

51. The previously described scheme and concerted action by such **defendants** constituted operations made through a pattern of racketeering activity in violation of 18 USC 1962.

52. As a result of the fraudulent and racketeering conduct of the **herein named defendants,** Ocaso has suffered damages.... such acts by **defendants** made necessary for Ocaso to make payments in the amount of ONE MILLION DOLLARS ($1,000,000.00)....

53. Plaintiff Ocaso is entitled to recover treble damages by reason of such violation by **defendants** pursuant to 18 USC 1964.
(emphasis ours).

shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901, 106 L.Ed.2d at 208; *Libertad v. Welch,* 53 F.3d at 445; *Aetna Casualty Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1561 (1st Cir.1994); *Feinstein v. Resolution Trust Corp.,* 942 F.2d at 45; *Fleet Credit Corp. v. Sion,* 893 F.2d at 447.

"Continuity" is both a closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement. Congress was concerned in RICO with long-term criminal conduct.

*H.J. Inc.,* 492 U.S. at 241–42, 109 S.Ct. at 2902, 106 L.Ed.2d at 209. In this case the Supreme Court also reversed the "multiple scheme" requirement adopted by various circuits to establish a pattern.

### 3. *Discussion*

█ All counts in the complaint are based on the same alleged conduct, i.e., a scheme developed and carried out by the defendants to defraud OCASO by inducing it to issue insurance based on inaccurate or false information. Plaintiff identifies four (4) instances where documents containing purportedly false information were forwarded by defendants and/or their agents through the use of the mail and wire systems [Complaint ¶¶ 12, 14, and 16]. The pleading alleges that the scheme commenced on or about **June 30, 1991** when GRIFFITHS was initially contacted [¶ 12] and concluded in **February 1992** when OCASO signed the insurance certificate. [¶ 21]

The relatedness requirement is easily satisfied in this case since the predicate acts, as set forth by plaintiff, form part of a common fraudulent scheme; all directed to a common end, obtain insurance from OCASO.

When examined for purposes of continuity under section 1962(c), the duration of the scheme as set forth in the complaint, is an ephemeral one. The machinations described lasted merely seven (7) months which does not support an inference of continued criminal conduct. Additionally, no information was included in the pleadings to justify an inference of possible repetition. Thus, the close-ended period described in the complaint does not comport with the necessary duration requirements set forth by the Supreme Court.

Plaintiff has attempted to support the prospect of repetition by making reference to a complaint filed in the Southern District of New York by five (5) insurers against eight (8) defendants [19] purportedly tracing a similar scheme. However, we find this suggestion without merit. Apart from the lack of privity between the parties to both suits, the document merely contains unproven allegations which bear no possible evidentiary value in this case.[20] Thus, plaintiff has failed to appropriately claim the prospect of repetition of the criminal activity as required by RICO.

Based on the foregoing, the allegations set forth in the complaint do not adequately plead continuity of the racketeering activities by the enterprise and the SEVENTH CAUSE OF ACTION of the complaint must be dismissed.

### V. *CONCLUSION*

Based on the foregoing, the outstanding motions listed below are hereby disposed of as follows:

I. Plaintiff's Motion for Partial Summary Judgment against PUERTO RICO MARITIME SHIPPING AUTHORITY and PUERTO RICO MARINE MANAGE-

---

19. *See* attachment to plaintiff's Opposition ... (docket No. 129).

20. According to defendants, that action was eventually dismissed voluntarily by the plaintiffs to the action. *See* defendants' Reply ... (docket No. 140) at 7.

MENT, INC. (docket No. 113) is hereby **DENIED.**[21]

II. The Motion for Summary Judgment filed by PRMSA/PRMMI (docket No. 117) is **DENIED.**[22]

III. The Motion for Summary Judgment filed by codefendants JAMES R. WINING, in his personal capacity, FINANCIAL GUARDIAN, INC., WORLD AMERICAN UNDERWRITERS, INC and WORLDSURANCE, INC. (docket No. 118) is hereby **GRANTED.**[23] Accordingly,

A. The FIRST CAUSE OF ACTION is hereby **DISMISSED** as to all defendants except for PRMSA/PRMMI for failure to state a claim under Laws of P.R.Ann., tit. 31 § 3514 (1991) since these defendants are not parties to the contract. Additionally, the claim for damages is dismissed as to all defendants as time-barred.

B. The SECOND CAUSE OF ACTION is hereby **DISMISSED** as time-barred.

C. The THIRD CAUSE OF ACTION is hereby **DISMISSED** as time-barred.

D. The FOURTH CAUSE OF ACTION is hereby **DISMISSED** as to all defendants except for PRMSA/PRMMI for failure to state a claim under Laws of P.R.Ann., tit. 26 § 1110 (1976) since movants are not parties to the insurance contract.

E. The FIFTH CAUSE OF ACTION is hereby **DISMISSED** for failure to state a cause of action.

F. The SIXTH CAUSE OF ACTION is hereby **DISMISSED** as time-barred.

IV. The Motion to Dismiss filed by defendants (docket No. 116) is hereby **GRANT-ED**[24] and the SEVENTH CAUSE OF ACTION (RICO Count) is hereby **DISMISSED** for failure to establish "continuity".

Judgment shall be entered accordingly.

IT IS SO ORDERED.

---

21. *See also* NAVIERAS' Response ... (docket No. **125**); Motion to Strike and in the Alternative, Opposition to Plaintiff's Motion for Summary Judgment filed by PRMSA/PRMMI (docket No. **126**); Opposition to Plaintiff's Partial Summary Judgment filed by FINANCIAL GUARDIAN, INC. WORLD AMERICAN UNDERWRITERS, INC., WORLDSURANCE, INC and JAMES R. WINING (docket No. **132**). The Motion Requesting Leave to Reply to Defendants' Oppositions filed by plaintiff, (docket No. **135**) is **GRANTED.**

22. *See* Plaintiff's Opposition ... (docket No. **128**); Reply ... filed by PRMSA/PRMMI and Motion Submitting Certified Translations ... filed by PRMSA/PRMMI (docket No. **127**). The Motion Requesting Leave to Reply (docket No. **138**) is **GRANTED.**

23. *See* Plaintiff's Opposition ... (docket No. **128**) and codefendants' Reply ... (docket No. **141**).

24. *See* Plaintiff's Opposition ... (docket No. **129**) and Reply ... (docket No. **140**).