**CENTURY PACKING CORPORATION, Plaintiff,**

v.

**GIFFIN SPECIALTY EQUIPMENT CO., LLC, Defendant.**

**No. CIV. 02–2143(RLA).**

United States District Court, D. Puerto Rico.

July 14, 2006.

Yolanda Benítez–Sánchez, Esq., Luis Cotto–Román, Esq., San Juan, PHV Jolyda Otylie Swaim, Esq., Olsson, Frank & Weeda, Washington, DC, for Plaintiff/Petitioner.

Edgardo Colón–Arrarás, Esq., Goldman Antonetti & Córdova, San Juan, Ina M. Berlingeri–Vincenty, Esq., Greenber Traurig PA, Fort Lauderdale, FL, PHV Gerard W. Ittig, Esq., Ittig & Ittig PC, Washington, DC, for Defendant/Respondent.

### OPINION AND ORDER

ACOSTA, District Judge.

Plaintiff Century Packing Corporation (CENTURY), a Puerto Rico corporation, brought this suit against defendant Giffin Specialty Equipment Co. (GIFFIN), of Farmington, Michigan, claiming that GIFFIN breached its contractual obligations due to the failure of its custom-built mass production oven to provide plaintiff's product (vienna sausages) within a specified

time (45 minutes). CENTURY also prays that judgment be entered in accordance with the provisions of the Puerto Rico Civil Code in that GIFFIN committed fraud ("dolo") by engaging in deceit by fraudulently inducing CENTURY to purchase the oven. CENTURY requests as well the imposition of attorneys fees as a sanction for temerity under the provisions of P.R. Laws Ann. tit.32, App. III, R. 44.1(2d) (2000).

## I. Findings of Facts

The Court having carefully considered the testimony presented at trial together with the pleadings and documents admitted into evidence, hereby makes the following findings of facts:

CENTURY is a corporation organized under the laws of the Commonwealth of Puerto Rico. CENTURY was founded by Mr. Miguel Vázquez, Sr., in September 1963. Mr. Miguel Vázquez, Jr. (VAZQUEZ) has been the company's President since 1993. VAZQUEZ is sole owner of the CENTURY facilities located in Caguas, Puerto Rico. As President, VAZQUEZ is in charge of the management of CENTURY's daily operations and has worked all his adult life at CENTURY.

CENTURY has been processing vienna sausages for approximately forty-three years under the brand name "Carmela". CENTURY's Carmela brand vienna sausages have distinct characteristics in terms of color, skin texture and flavor that distinguish them from the competition. The Carmela vienna sausage has a reddish brown deep color and its skin is firm,

unwrinkled and slimmer in diameter.[1] No color additives are used to impart color to the Carmela sausages. Instead, the color is achieved by application of intense heat during the cook cycle inside the oven. The manufacturing process entails the formulation of an emulsion composed of ground chicken breast, spice, caramel and water, which is placed in cellulose casings. The casings are introduced into the oven where the cook cycle takes place. After the cook cycle is completed, the product is showered before undergoing a canning process. The canning process entails a retort phase in which the canned sausages are placed in an autoclave for sterilization at very high temperatures to kill bacteria and make the product shelf stable. Following this process, Century's canned vienna sausages are ready for human consumption.

Defendant GIFFIN is owned by Donald J.P. Giffin (MR. GIFFIN) who is also its President. MR. GIFFIN is the sole stockholder and President of Giffin, Inc., which manufactures ovens and related equipment for the automobile industry. These ovens are used by automakers in their plant assemblies to cure or "bake" the paint onto mass-produced automobiles.

MR. GIFFIN had been in the automotive industry for numerous years when he became acquainted with Andrew Gladd, Sr., founder and President of Gladd Cooking and Chilling Systems (GLADD COMPANY), a company that designed and manufactured meat processing ovens, also known in the meat processing industry as "smokehouses".

In 1998, GIFFIN acquired the GLADD COMPANY and the rights to use the

---

1. Three competitive brands sold in Puerto Rico were admitted into evidence. The Court noted the following characteristics of the other brands when compared with the Carmela brand: "Armour" brand (Exh. 21) lighter "pinkish" color, fatter, wetter, wrinkled.

"Picnic" (Exh. 21A) wrinkled, light color, lighter than "Armour", fatter than Carmela, wetter. "Hormel" (Exh. 21B) also lighter than Carmela and bigger in diameter, with a "wet" look.

Gladd name and technology, including the rights to the patented "Alternating Horizontal Air Flow Design".

In 1999 VAZQUEZ decided to upgrade the manufacturing equipment at CENTURY's facility by purchasing a new ingredients mixer and a grinder. At that time CENTURY was using in its facility three (3) German-made "Fessman" ovens which had been acquired by CENTURY in 1985.[2]

The Fessman ovens required a cook cycle of one hour-and 30–40 minutes to cook the vienna sausages. At the completion of this time period, the finished product was a vienna sausage with a distinctive reddish brown color, firmness, and outer skin texture.

Although VAZQUEZ was satisfied with the performance of the Fessman ovens, he considered purchasing an additional oven inasmuch as the acquisition of the new mixer and grinder would require another oven to handle the increased production.

CENTURY's interest in the Giffin oven arose at a trade show in Atlanta in 2000. VAZQUEZ visited GIFFIN's booth, where he met and spoke with Edward L. Campbell (CAMPBELL), General Manager of GIFFIN. A display of an oven, showing, with the aid of feathers, the air changes and movements of the Alternating Horizontal Air technology, caught VAZQUEZ's attention. Mr. CAMPBELL informed VAZQUEZ that due to this technology and the rapid air changes it generated, Giffin's ovens had the effect of reducing processing time and increasing production. The Fessman ovens in operation at CENTURY's facility used vertical air flow. VAZQUEZ inquired whether Giffin's ovens could reduce the cook cycle of his product, indicating that it took approximately one hour and thirty minutes to one

hour and forty minutes to cook CENTURY's vienna sausages in the existing Fessman ovens. CAMPBELL informed VAZQUEZ that due to the use of the "Alternating Horizontal Air Flow" system, the Giffin ovens could cook hot dogs in just forty-five minutes and since vienna sausages were smaller and thinner they could be cooked in less time.

Thus, GIFFIN proposed to CENTURY a new, custom-built oven that would increase CENTURY's production capacity. GIFFIN claimed that CENTURY's "total process cycle" would be reduced as a result of the "new patented alternating Horizontal Air Flow Design" and that the savings generated by the purchase of its oven "will not only pay off your capital investment, but also will ultimately increase the profitability of your company".[3]

As a result of these representations, VAZQUEZ, at the invitation of CAMPBELL, decided to visit GIFFIN's manufacturing facility in Farmington, Michigan, to personally meet MR. GIFFIN and tour the two plants in which hot dogs were purportedly being cooked in a forty-five-minute cook cycle in Gladd-designed and manufactured ovens with the Horizontal Air Flow technology.

VAZQUEZ toured the two plants with company names of Koegels and Salays. After visiting these plants he remained unconvinced that his product, particularly the distinctive color of CENTURY's vienna sausages, could be accomplished within the forty-five-minute cook cycle that, according to CAMPBELL, was used for cooking hot dogs in the Gladd ovens installed at these two plants.

VAZQUEZ pointed out to CAMPBELL that the hot dogs that he saw at the first

---

2. Replacement Fessman ovens were also acquired in 2003 and 2004.

3. January 26, 2000 GIFFIN letter to CENTURY.

plant (Koegels)[4] came out of the oven looking a little pale and that the color of CENTURY's sausages was different. CAMPBELL told VAZQUEZ not to worry, that the color would be accomplished within the forty-five-minute cycle. At this time CAMPBELL had not seen the vienna sausages manufactured by CENTURY. It was not until CAMPBELL later visited CENTURY's facility in Caguas, Puerto Rico, that he saw CENTURY's product for the first time.

CAMPBELL was, from the outset, the lead individual from GIFFIN on the project. As General Manager of GIFFIN, he was in charge of sales and marketing and was the person with the background and experience in the meat industry. Neither MR. GIFFIN nor Engineer Benson Lange (LANGE), the two other witnesses called by GIFFIN to testify, had any prior experience in the meat processing industry.

CAMPBELL, who had worked at the GLADD COMPANY until its acquisition by GIFFIN, became the main person counted upon by GIFFIN to introduce and market the new GIFFIN meat processing ovens in the meat industry. More importantly, he was the GIFFIN official—and representative—who discussed with VAZQUEZ the operational specifications of the Giffin oven and eventually established in GIFFIN's proposal the cook cycle time specification of "45 minutes-approximately".

In April 2000, GIFFIN transmitted to CENTURY a written proposal which included express representations of the performance specifications that the Giffin oven would meet. On June 13, 2000, CENTURY entered into a purchase agreement with GIFFIN for the design, manufacture and installation of a custom built meat processing oven to be used for the production of vienna sausages at CENTURY's facility in Caguas, Puerto Rico. The oven sold by GIFFIN to CENTURY was designed, built and installed by GIFFIN using the resources of Giffin, Inc. and was the first meat processing oven sold by GIFFIN since its acquisition of the GLADD COMPANY.

The proposal was submitted with a cover letter dated April 20, 2000, signed by CAMPBELL. Among the numerous features highlighted was that its patented "Alternating Horizontal Air Flow" design would "unlike any other, [provide] greater consistency in product internal temperature while *reducing your overall cooking and chilling cycle*". (Emphasis ours).

The third page of GIFFIN's April 20, 2000 proposal explicitly states the operational specification for the cook cycle time as "45 minutes—approximately". Notwithstanding, after the Giffin oven was installed and tested at CENTURY's facility, it became clear that the oven was incapable of producing within forty-five minutes, CENTURY's finished product, with all attendant appearances and characteristics of the Carmela brand.

GIFFIN's representations to CENTURY that the cooking cycle for the new oven would be a mere forty-five minutes—a stark contrast to the average 90 to 120 minute interval required to cook sausages in CENTURY's older Fessman ovens—was material and essential to CENTURY's decision to enter into the oven purchasing agreement.

The issue at trial was the meaning of the term "cook cycle" used in the Giffin oven operational specifications. According to GIFFIN, the forty-five-minute cook cycle specification only required that the sau-

---

**4.** During the visit to the second plant, Salays, VAZQUEZ was unable to see any product coming out of the Gladd oven as it was not in operation at the time.

sages reach an internal temperature of 165°F within forty-five minutes; whereas plaintiff contends it meant achieving a finished product with the distinctive characteristics of the Carmela vienna sausage.

Based on the evidence presented, the Court finds that it was the parties' unequivocal intention for GIFFIN to provide and CENTURY to receive an oven that would produce a finished product within a "cook cycle time" of "45 minutes-approximately". The Court has reached this determination based on the following:

First, neither the "cook cycle" nor cooked condition of the product are defined in GIFFIN's proposal accepted by CENTURY as the point where the internal temperature of the product being cooked reaches a specific temperature. The only mention of temperature in GIFFIN's proposal is the temperature range of 125°F to 215°F, specified as the temperature range that the air inside the oven can reach in the various steps of the cook cycle process.

Second, the uncontroverted expert testimony of EDWIN RIMSKY and STEVE GILKES, both of whom were qualified as experts in the meat industry—specifically in industry practices, meat processing ovens and development of cook cycles—established that a cook cycle includes all the steps or stages that take place inside the oven to produce a finished "signature" product, that is both edible and sellable.

Both RIMSKY and GILKES, plaintiff's experts who, incidentally, were originally hired by defendant to check the functioning of the oven, testified that color development, skin formation, product consistency and texture are essential elements of a cook cycle. During cross examination by GIFFIN's counsel, RIMSKY, a veteran of the food industry with over forty years of experience, testified that when an oven manufacturer is dealing with a customer that already has a product in the market and wants an oven to cook that product, the manufacturer of the oven must seek to duplicate such end product. In RIMSKY's words, the oven should be designed so that "the oven accommodates the product, not the product accommodates the oven."

RIMSKY further testified that in all his years in the meat processing industry he had not seen any contract for the design and manufacture of a meat processing oven or smokehouse in which the particular required characteristics of the finished product were spelled out. He explained that, in the food processing industry, it is "a given" that the product for which the oven is intended will be duplicated and that those customers that already have a product, such as CENTURY (which has been manufacturing vienna sausages for over 43 years), will assume that the oven will be able to duplicate their product. Both RIMSKY and GILKES completely disagreed with GIFFIN's contention that the term cook cycle merely refers to the reaching of an internal temperature in which a product is deemed cooked or fully cooked, as required by USDA standards. They testified further that before designing an oven and establishing its operational parameters, specifically the cook cycle time, the manufacturer must *also* have seen the finished product to be cooked in the oven and have reviewed the manufacturing and processing system being used by the client to produce the product. RIMSKY pointedly stated that the oven manufacturer must first familiarize itself with the finished product "then work back".

Third, all of the extrinsic evidence presented to the Court, specifically the parties' acts before, contemporaneous and subsequent to the purchase sale agreement, supports the Court's finding that the operational specifications established in

the contract required the Giffin oven to produce a finished product, meaning a signature CENTURY vienna sausage with its distinctive characteristics in "45 minutes—approximately".

CAMPBELL was called by GIFFIN to testify on its behalf at trial. However, due to his inability to recall many of the events and pertinent dealings, CENTURY requested permission to submit as evidence (and GIFFIN agreed) the transcript of the deposition of CAMPBELL taken on January 18, 2005. In his deposition, CAMPBELL testified that even though he was convinced that CENTURY's vienna sausages could be cooked within 30 minutes—or perhaps even less due to their size being smaller than the regular size of hot dogs—he added fifteen (15) minutes to the cook cycle specification because he knew it would take "a little bit longer for the color"; that is, to achieve the desired color. Thus, based on CAMPBELL's deposition testimony, it was clearly CAMPBELL's intention, as well as CENTURY's, to develop the required color characteristic of CENTURY's finished product, within a cook cycle time of forty-five (45) minutes, approximately.

Defendant's witnesses, MR. GIFFIN and Engineer LANGE testified that the oven was only required to cause the internal temperature of the product to reach 165°F, yet consistently referred to CAMPBELL as the person who discussed with VAZQUEZ and established the forty-five (45) minutes cook cycle time operational specification.

Throughout the bid-quotation phase, VAZQUEZ insisted that he would only entertain GIFFIN's proposal if GIFFIN personnel visited CENTURY's production to corroborate the feasibility of the Giffin oven's installation and operation after personally seeing CENTURY's product and manufacturing process.

On June 13, 2000, MR. GIFFIN, accompanied by GIFFIN Engineer Gregory Ritz and CAMPBELL, visited CENTURY's facility in Caguas, Puerto Rico. MR. GIFFIN personally saw CENTURY's product during the manufacturing process and as it came out of the Fessman ovens. In fact, this was the first time that MR. GIFFIN and CAMPBELL had seen CENTURY's product, even though by that time GIFFIN had already proposed to design and build an oven for CENTURY that would perform within a forty-five (45) minute cook-cycle. This, according to the testimony of RIMSKY and GILKES, whose credibility the Court does not question, was contrary to practices generally followed by experienced meat processing ovens manufacturers.

Following the inspection and evaluation of CENTURY's processing during which MR. GIFFIN took copious notes, MR. GIFFIN reiterated his guarantee that the oven would meet the performance specifications. After returning to his office in Michigan, MR. GIFFIN used his notes to prepare minutes of what he referred to as the "pre-award" meeting held at CENTURY's facility on June 13, 2000. In these minutes, MR. GIFFIN listed and described in detail the "clarifications and open issues pertaining to the equipment being purchased". Although by then MR. GIFFIN and his personnel, including CAMPBELL, had seen CENTURY's finished product and had reviewed CENTURY's entire manufacturing process, no clarification was made in these minutes of the "45 minutes-approximately" cook cycle time. In fact, item fifteen (15) of the minutes states that "[t]he [oven] control system will be provided with a product internal temperature mode *and timing mode for the cooking cycle*" and that "CENTURY will have the ability to select

either mode to control their cooking cycle". (Emphasis ours).

Following the inspection of CENTURY's facility, and as a direct result of MR. GIFFIN's personal assurances of the forty-five (45) minute cook cycle performance, VAZQUEZ prepared a purchase order for the Giffin oven, with a cover letter and a down payment check equivalent to twenty (20) percent of the total purchase cost. As VAZQUEZ expressly stated in CENTURY's June 13, 2000, purchase order, CENTURY confirmed it was buying the Giffin oven as presented by GIFFIN in its April 20, 2000 quote.

At no time during the design and manufacturing of the Giffin oven did GIFFIN alter the forty-five-minute cook cycle specification.

On November 18, 2001, the oven arrived in Puerto Rico and in December 2001, the oven was assembled and installed at CENTURY's facility by GIFFIN's personnel. The Giffin oven's start-up was scheduled to commence in early 2002, but it was not until April 2002, that GIFFIN employees performed what became the first of two oven validation and start-up attempts. The start-up process continued throughout May 2002.

In light of GIFFIN's failure to achieve the promised oven performance during the April 2002 start-up attempts, GIFFIN scheduled the second round of testing and adjusting to be conducted by KEN HASS, control engineer of the Atkins–Benham Company including GIFFIN Engineer BENSON LANGE[5] and STEVEN GILKES of G & S Processing Systems.

After a brief inspection of the oven and CENTURY's production, GILKES was reluctant to conclude that the Giffin oven could muster a cooking cycle in any time close to forty-five minutes. GILKES immediately informed CENTURY's President, VAZQUEZ, and LANGE of his opinion.

After spending almost five (5) days working on the oven and trying out different cooking cycles with varying combinations of temperatures and duration, GILKES concluded that the least amount of time required by the Giffin oven to cook CENTURY's product and achieve the characteristics of the finished product, was one hour and forty-five minutes (1 hr. 45 min.) which he also characterized as "optimistic". According to GILKES, the oven's best performance required two (2) hours to correctly cook CENTURY's product.

During the May 2002 testing, both GILKES and LANGE worked together with other GIFFIN personnel on site attempting to achieve CENTURY's finished product, that is, cooking the vienna sausages to reach their final appearance in terms of color, consistency and texture within the forty-five-minute cook cycle benchmark, not just merely reaching a USDA required temperature within that time frame.

A meeting held on site between VAZQUEZ and GIFFIN's personnel on May 22, 2002, produced what became GIFFIN's first express admission of non-performance. No amount of adjustment, GIFFIN personnel said, would bring the oven up to the forty-five (45) minute cook-cycle specification. Indeed, LANGE, as testified by VAZQUEZ and GILKES, admitted that "we cannot meet the specification" and wrote the same in his own personal notes of the meeting. It was only after GIFFIN realized that the Giffin oven

---

**5.** Benson Lange was involved from 1984 to 1998 in the auto painting industry. He joined Giffin International at about the same time GIFFIN acquired GLADD. He had no direct involvement with the design or negotiations concerning the oven subject of this suit.

would not perform according to the forty-five-minute cook-cycle time specification, that GIFFIN took the position that all that was required was for the sausages to meet the USDA minimum standard for a cooked product and nothing more.

GIFFIN attempted to establish that the internal product temperature of the sausages reached 165°F within forty-five minutes but it was unable to even demonstrate this. The temperature readings used by LANGE to try to establish this are unreliable and inconclusive. For instance, the probes used during the May 2002 testing to measure the internal temperature of the sausages while inside the oven during the cook cycle could not give accurate readings due to the difficulty of maintaining the probes properly placed inside the sausage casing. GILKES explained that the probes were rupturing the casing and causing the sausage emulsion to leak and the probes to move and fall. This explains the abrupt changes in the internal product temperature readings recorded by LANGE in his log.

On February 20, 2003, GILKES and RIMSKY visited CENTURY's facility at the request of VAZQUEZ to verify the performance of the oven. As certified by GILKES—the only witness common to both the May 2002 and February 2003 testing—the oven "remained exactly as he had last seen the unit during the May 2002 round of testing".

The results of the tests conducted on February 20, 2003, by GILKES and RIMSKY were consistent with the previous results: the Giffin oven's best performance required at least two (2) hours to replicate CENTURY's signature product.

The amount of time employed by the Giffin oven to properly cook CENTURY's product was essentially the same time, if not longer, than it took to cook in the existing "Fessman" ovens. No further modification of the Giffin oven's components was possible. As GILKES testified, all that could be possibly done to optimize the Giffin oven's performance was attempted and completed in the first round of testing (May 2002).

In April 2003, GILKES and RIMSKY submitted a joint report detailing the oven verification testing performed on February 20, 2003. The report confirmed GILKES' May 2002 assessment that the oven could not perform the cooking cycle in an amount of time that could approximate the promised forty-five-minute cook cycle goal. As GILKES and RIMSKY described in their report:

"When forty five (45) minutes has elapsed, the cooking procedure was completely stopped to check the status of Century's product. As expected, the product was not cooked or even hot to the touch. The product itself was completely raw and remained at room temperature."

GILKES and RIMSKY concluded that the two-hour cook cycle programming identified in the Giffin oven's control panel as "Recipe 2"—a program which was created by GILKES in May 2002 under the supervision of GIFFIN's Benson LANGE—was "the optimum configuration the Giffin oven can handle...".

RIMSKY, who witnessed the February 2003 testing, certified that "the cooking cycle testing conducted by Steven Gilkes is consistent with accepted industry practices and properly and accurately reflects the cooking performance capabilities of the Giffin oven."

The Court gives complete credence to RIMSKY, a smokehouse designer and constructor with over forty (40) years of experience in the field when he concluded the following:

No experienced professional could truthfully represent that any similarly configured oven could cook Century's product with the coloration, texture and consistency in the promised forty-five (45) minute period.

During the testing done by GILKES and LANGE in May 2002, at a forty-five-minute cook cycle, or upon reaching an internal temperature of between 155°F to 165°F, the vienna sausages had not developed the required skin texture and could not be canned because of the lack of sufficient consistency necessary for canning. In their conclusion the sausages were "blobby" or "mushy".

## II. The Law

Plaintiff instituted this action alleging that the defendant fraudulently induced it to purchase and install a mass production oven for cooking vienna sausages by misrepresenting what to CENTURY was a crucial characteristic of the oven or, in the alternative, that GIFFIN breached the terms of the purchase agreement subscribed by failing to deliver an oven that would cook CENTURY's product within the cook cycle time operational specification of "45 minutes-approximately."

Inasmuch as this is an action based on diversity of citizenship, Puerto Rico substantive law is applied to determine liability. Furthermore, "[i]n federal diversity cases involving claims of fraud, state law governs all issues related to the substantive elements of fraud and the burden of proving fraud at trial." *Generadora de Electricidad del Caribe, Inc. v. Foster Wheeler Corp.*, 92 F.Supp.2d 8, 18 (D.P.R. 2000), (citing *P.C.M.E. Commercial, SE v. Pace Membership*, 952 F.Supp. 84, 88 (D.P.R.1997); *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Borschow Hosp. & Med. Supplies v. Cesar Castillo*, 96 F.3d 10, 15 (1st Cir.

1996); *Marina Indus., Inc. v. Brown Boveri Corp.*, 114 P.R. Dec. 64, 72, 1983 WL 204219 (1983)).

### A. Fraudulent Inducement ("Dolo")

Plaintiff alleges that the contract for the GIFFIN oven was null and void because its consent was procured through deceit or "dolo". The Puerto Rico Civil Code provides that no valid contract exists unless there is the (1) consent of the parties, (2) an object of the contract, and (3) cause for the obligation. *See* P.R. Laws. Ann. tit. 31 § 3391 (1991). "Consent given by ... deceit shall be void." § 3404; *See also, OCASO, S.A., Compania de Seguros Y Reaseguros v. Puerto Rico Maritime Shipping Author.*, 915 F.Supp. 1244, 1257 (D.P.R.1996).

Under Puerto Rico's contract law, fraud which affects a contracting party is commonly referred to as "dolo" or deceit. *See, Fournier v. E. Airlines, Inc.*, 655 F.Supp. 1037, 1038–39 (D.P.R.1987); *Marquez v. Torres Campos*, 111 D.P.R. 854, 1982 WL 210682(PR). "Dolo" can be manifested in the formation of a contract where a party obtains the consent of another through deceptive means. *See* P.R. Laws Ann. tit. 31 §§ 3404 to 3409 (1991); *see also, P.C.M.E. Commercial*, at 92.

"Dolo" in the formation of contracts is regulated by the Puerto Rico Civil Code, Articles 1217, 1221, and 1222, which set forth the requirements for the validity of contracts. Article 1217 of the Civil Code, P.R. Laws Ann. tit. 31 § 3404 (1991), provides that any contract where the consent of the parties is given by deceit ("dolo") shall be void. The Code goes on to specify, in its Article 1221, P.R. Laws Ann. tit. 31 § 3408, that "[t]here is deceit when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract

*which without them he would not have made."* (Emphasis ours).

Furthermore, for "dolo" or fraud to exist, a mischievous act is not needed, but only the debtor's knowledge of his/her own lack of compliance, with the consciousness that the creditor's expectations will be affected. *Mayaguez Hilton Corp. v. Betancourt,* 155 D.P.R. ——, 2002 WL 272598 (2002), 2002 TSPR 23, 2002 JTS 29.

■ Contrary to those agreements which may be ratified, a contract which lacks the necessary consent due to "dolo" is null *ab initio,* i.e., from its inception. *See, Ocaso,* 915 F.Supp. at 1257. Thus, the declaration of the nullity of an obligation or a declaration that a contract is void requires the contracting parties to "restore to each other the things which have been object of their contract with their fruits and the value with its interest, without prejudice to the provisions contained in the following sections". P.R. Laws Ann. tit. 31 § 3514.

■ The Court finds, however, that the testimony and the evidence introduced at trial does not establish conduct rising to a level sufficient to invoke the provisions of the "dolo" statute. What the evidence does show (as more fully explained below) is a lack of knowledge of the specialized practices of a different industry which GIFFIN should have familiarized itself with before entering and offering services it was not prepared to provide. This, however, does not constitute intentional deceit as required by the Civil Code.

Therefore, we find plaintiff failed to establish a cause of action under the "dolo" statute.

### B. *Breach of Contract*

■ Puerto Rico substantive law is solidly grounded in the civil law tradition for purposes of contract formation and interpretation. The basis of all contractual analysis is Article 1206 of the Civil Code of Puerto Rico, which states that "[a] contract exists from the moment one or more persons consent to bind himself or themselves, with regard to another or others, to give something or to render some service". P.R. Laws Ann. tit. 31 § 3371 (1991).

Under Puerto Rico law, the freedom of the contracting parties will be respected as long as it does not contravene "law, morals, or public order". P.R. Laws Ann. tit. 31 § 3372 (1991). Furthermore, certain ethical principles govern contractual relationships, so that "fair play" is employed by the parties in their contractual endeavors. "Contracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law". P.R. Laws Ann. tit. 31 § 3375 (1991).

It is important to highlight that the concept of "good faith" creates special conduct responsibilities for each case in accordance with the juridical relationship and the end intended by the parties. *Rodríguez Reyes v. Caribbean Hosp. Corp.,* 141 D.P.R. 182 (1996), 1996 WL 499123 (P.R.). The First Circuit Court, in the case of *Adria Int'l Group, Inc. v. Ferré Dev., Inc.,* 241 F.3d 103, 108 (1st Cir.2001)(citing the Restatement (Second) of Contracts sec. 205(a)(1981)), held that "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party".

On the other hand, Article 1223 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31 § 3471, states, in part, that "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipula-

tions shall be observed". *See also, Franceschi v. Hosp. General San Carlos, Inc.,* 326 F.Supp.2d. 257, 264 (D.P.R.2004).

It has been held that "[a] term is clear 'when it is sufficiently lucid to be understood to have one particular meaning, without room for doubt.'" Once determined that the contract's terms are "sufficiently clear so that only one meaning is possible, the court cannot dwell on the alleged 'intent' of the parties at the time they entered into the contract". *Ysiem Corp. v. Comm. Net Lease Realty, Inc.,* 198 F.Supp.2d 110, 115 (D.P.R.2002) (quoting *Hopgood v. Merrill Lynch,* 839 F.Supp. 98, 104 (D.P.R.1993) (internal citations omitted)).

Pursuant to Art. 1233, when the contract terms are not clear and "the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail". P.R. Laws Ann. tit. 31 § 3471 (1991).

The Civil Code sets the guidelines for ascertaining the "intention of the contracting parties". In this respect, it provides that "[i]n order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract". P.R. Laws Ann. tit. 31 § 3472 (1991).

Based on the aforementioned Civil Code provisions, the construction of a contract terms should start with the written expressions. However, it is not circumscribed to a literal and grammatical analysis, extending to fundamentally inquire the true intention of the parties and the spirit or purpose permeating over the entire business which may be inferred from the concurrent circumstances and the total behavior of the interested parties. *Cooperativa La Sagrada Familia v. Castillo,* 107 D.P.R. 405 (1978), 1978 WL 48850 (P.R.).

In line with the above, Article 1235 of the Civil Code of Puerto Rico provides that "[h]owever general the terms of the contract may be, there should not be understood as included therein things and cases different from those with regard to which the persons interested intended to contract". P.R. Laws Ann. tit. 31 § 3473 (1991).

In relation to words with different meanings in contracts, it has been established that they "...shall be understood in that which may be most in accordance with the nature and object of the contract". P.R. Laws Ann. tit. 31 § 3476.

In situations where there are obscure or ambiguous dispositions, their interpretation "...must not favor the party occasioning the obscurity". P.R. Laws Ann. tit. 31 § 3478. It is for that reason that the Supreme Court of Puerto Rico has held that ambiguities in a contract should be construed against the party who drafted it. *González v. Coop. de Seguros de Vida de P.R.,* 117 D.P.R. 659, 662, 1986 WL 376763 (P.R.). Finally, the right to rescind reciprocal obligations is implicit in cases where obligors do not fulfill what has previously been agreed to. In this respect, Article 1077 of the Puerto Rico Civil Code provides, in pertinent part:

> The right to rescind the obligations is considered as implied in mutual ones, in case one of the obligated persons does not comply with what is incumbent upon him.

> The person prejudiced may choose between exacting the fulfillment of the obligation or its rescission, with indemnity for damages and payment of interest in either case. He may also demand the rescission, even after having requested its fulfillment, should the latter appear impossible.

The court shall order the rescission demanded, unless there are sufficient causes authorizing it to fix a period. . . .

P.R. Laws Ann, tit. 31 § 3052 (1991).

In light of the above precepts, the Court makes the following findings:

### (1) The Term "cook cycle".

Giving total credence to plaintiff's experts, the Court finds that the meaning of the term "cook cycle" in the meat industry is clear and is not reasonably subject to interpretation. A cook cycle clearly encompasses all processes that take place while the product is inside the oven to achieve a finished product. This includes not only reaching a certain internal temperature for the product to be deemed "cooked" by USDA standards but also skin formation consistency, texture and color development.

Although the contract does not define the term "cook cycle", the authorities in the industry, as well as common sense, dictate that it must encompass all stages inside the oven to reach a finished product. Nowhere does the contract state that such a term refers to the point where the internal temperature of the product reaches a specific temperature.

### (2) The Finished Product.

The undisputed evidence at trial clearly showed that at the end of the forty-five-minute cook cycle, the product not only lacked the distinctive color and skin characteristics of the Carmela vienna sausages brand but was "mushy" and without the necessary consistency to be canned and marketed.

As previously stated, in the discharge of their "good faith" duty, the parties to a contract must observe "faithfulness to an agreed common purpose and consistency with the *justified expectations of the other party*". *Adria Int'l Group, Inc., et al. v. Ferre Dev. Inc., et al.,* 241 F.3d at 108 (italics supplied).

GIFFIN's interpretation of the meaning of the term "cook cycle"—included by it in its proposal—can only be construed as evidence of GIFFIN's complete lack of understanding and knowledge of the meat industry, which ignorance became evident at trial.

The term "cook cycle" cannot amount to merely reaching an internal temperature which, alone, did not make the product susceptible of being canned and, much less, sold to customers. Certainly, it was a reasonable expectation of CENTURY that the term "cook cycle" referred to reaching a final product for sale. The interpretation GIFFIN proposes is disingenuous. CENTURY is an enterprise devoted to the manufacture of vienna sausages and as a commercial manufacturer, the time it takes to produce its product is of the essence. CENTURY's main interest in the GIFFIN oven was its purported reduced "cook cycle", which was a significant advantage over CENTURY's "cook cycle" of one hour and forty minutes to two hours with the Fessman ovens. It goes without saying that it could not be CENTURY's expectation to pay approximately three hundred thousand dollars for an oven which would perform in an equal or longer time period than its existing Fessman ovens.

### (3) The Extrinsic Evidence.

Even if this Court assumed that the term "cook cycle" as used in the contract is ambiguous, the parties' conduct unequivocally shows that it was their intention that the Giffin oven would produce a finished product within the forty-five-minute cook cycle established in the operational specifications.

For instance, after installation of the oven GIFFIN found it necessary to retain

GILKES' services to work with LANGE on the oven in Puerto Rico to attempt to obtain a finished product with the characteristics, including color, of CENTURY's vienna sausages in the forty-five-minute cook cycle time it had set as an operational specification; LANGE and GILKES continued to conduct tests and experiment with varying combinations of time and temperature to develop a cook cycle that would produce a finished product in the least amount of time; LANGE wrote in his notes of the May 22, 2002 meeting that "we cannot meet the specification". One point that must not be overlooked is the fact that the oven eventually proved to be capable of reaching the desired skin color and consistency. The only problem is that it required approximately the same amount of time as the (one hour and forty minutes) Fessman ovens.

Furthermore, if LANGE meant by "specifications" only a forty-five-minute cook cycle to reach a temperature of 165°F, why did GIFFIN fail to mention this when it drafted its June 13, 2000 proposal, or in any of its communications? Clearly such lack of clarity or omission cannot be allowed to benefit GIFFIN since it was the party that drafted the contract. *See,* P.R. Laws Ann. tit. 31 § 3478 (1991); *Gonzalez v. Cooperativa de Seguros de Vida de Puerto Rico,* 117 D.P.R. 659, 1986 WL 376763 (1986).

MR. GIFFIN alleges he did not commit to provide an oven that would produce a finished product within forty-five minutes, yet he failed to respond to VAZQUEZ's letter of November 19, 2001, in which VAZQUEZ credibly asserted that from the beginning he had stated the importance for his business that the Giffin oven achieve CENTURY's finished product in the promised forty-five minutes. Since such a statement was critical as to the intention of the parties, MR. GIFFIN had the obligation to respond if he was not in agreement.

Lastly, and with regards to CENTURY, from the beginning of the dealings between the parties VAZQUEZ was clear that what attracted him to the Giffin oven was its purported significantly faster cook cycle, attributed by GIFFIN to its use of the non-conventional "Horizontal Air Flow" technology and the prospect of reducing the cook cycle from the one hour and forty-five minutes to two hours required in the Fessman ovens.

Thus, the Court concludes that GIFFIN's conduct during its dealings and negotiations with CENTURY in the formation of the contract was negligent—the result of GIFFIN's lack of experience in the meat processing industry—which clearly breached a material condition of the contract entitling CENTURY to a rescission of the contract and the damages claimed.

## C. *Obstinacy Under Rule 44*

P.R. Laws Ann. tit. 32, App. III, R. 44.1(d) (2001) provides that "in the event any party or its lawyer has acted obstinately or frivolously, the Court shall, in its judgment, impose on such person the payment of a sum for attorney's fees". Additionally, pre-judgment interest is also mandated "on the party that has acted rashly". *Id.,* Rule 44.3(b).

These provisions have been found applicable to diversity cases where Puerto Rico substantive law provides the basis of decision. *Grajales–Romero v. Am. Airlines, Inc.,* 194 F.3d 288, 300–01 (1st Cir.1999); *Fajardo Shopping Ctr. v. Sun Alliance Ins. Co. of P.R., Inc.* 167 F.3d 1, 14 (1st Cir.1999); *Dopp v. Pritzker,* 38 F.3d 1239, 1252 (1994); *Newell Puerto Rico Ltd. v. Rubbermaid, Inc.,* 20 F.3d 15, 24 (1st Cir. 1994); *Jose A. Nunez Santiago v. Puerto Rico Elec. Power Auth.,* 206 F.Supp.2d 231

(D.P.R.2002). Further, once the court makes a finding of obstinacy the award of attorney's fees and imposition of prejudgment interest is mandatory. *Fajardo,* 167 F.3d at 14; *Dopp,* 38 F.3d at 1252; *Newell,* 20 F.3d at 24; *Blas v. Hosp. Guadalupe,* 146 D.P.R. 267, 334, 1998 WL 476260 (1998).

■ The term "obstinate" has been described by the courts as conduct which (1) forces an avoidable litigation, (2) needlessly prolongs it, or (3) requires the opposing party to engage in unnecessary efforts. *Dopp,* 38 F.3d at 1252; *Newell,* 20 F.3d at 24; *Jarra Corp. v. Axxis Corp.,* 155 D.P.R. 764, 2001 WL 1616775 (2001); *Blas,* 146 D.P.R. at 335, 1998 WL 476260; *Fernandez v. San Juan Cement Co., Inc.,* 1987 WL 448327, 118 D.P.R. 713, 718 (1987).

■ Relief under Rule 44 is not automatically granted to the prevailing party. *Dopp,* 38 F.3d at 1253. Rather, this provision aims to penalize a party responsible for causing unnecessary expenses and delays. *Nunez Santiago,* 206 F.Supp.2d at 234. The main purpose of awarding attorney's fees in cases of obstinacy is to impose a penalty upon a non-prevailing party whose stubbornness, obstinacy, rashness and insistent frivolous attitude has forced the other party to needlessly assume the pains, costs, efforts, and inconveniences of a litigation. *Fernández Marino,* 18 P.R. Offic. Trans. 823, 118 D.P.R. at 718, 1987 WL 448327. *See also, Fajardo Shopping Ctr.,* 167 F.3d at 14; *Dopp,* 38 F.3d at 1252.

Although Rule 44.1(d) does not define the term "obstinacy", the term has been discussed at length by the courts. In particular, the Puerto Rico Supreme Court has stated that "obstinacy is an attitude which casts its shadow over the proceedings and which affects the sound operation and administration of justice. It also subjects the innocent litigant to the ordeal of the judicial process and unnecessary costs, and to retainment of professional services, including attorneys, with the usually exorbitant burden to his pocket." *Fernández,* 18 P.R. Offic. Trans. at 829, 1987 WL 448327 (quoting commentator H. Sánchez, *Rebelde Sin Costas,* IV–2 Boletín Judicial 14 (1982)). A party shall be found obstinate if it "engages in actions which (a) make necessary litigation which could have been avoided, (b) prolongs the litigation unnecessarily, or (c) requires the other party to incur expenses in the pursuit of avoidable tasks". *Newell Puerto Rico, Ltd. v. Rubbermaid, Inc.,* 20 F.3d 15, 24 (1st Cir.1994).

An example of obstinacy is where a party risks litigating a case in which negligence appears *prima facie.* In that case the Supreme Court has stated that the party "should thus assume liability for its actions". *Fernández,* 18 P.R. Offic. Trans. at 831, 1987 WL 448327. If a defendant answers the complaint and denies his total liability in those circumstances, he is deemed obstinate, even if he subsequently accepts the liability. *Id.* at 830, 1987 WL 448327 (*citing Rodríguez Cancel v. A.E.E.,* 116 D.P.R. 443, 1985 WL 301227 (1985)). In addition, "[to] deny a fact knowing that it is true... constitutes obstinacy." *Id.* Therefore, the Supreme Court has stated that even "if the defendant does in fact believe that the amount sought is excessive and that is the only reason to oppose plaintiff's petitions [he should] frankly admit his liability, limiting the controversy to the fixing of the sum to be awarded." *Id.* at 831, 1987 WL 448327 (citations omitted). A defendant should thus deny only that which in good faith he wishes to challenge. *Id.* at 831.

Finally, in making a determination of obstinacy, the Courts consider the "personality of the case," because that which constitutes obstinacy at one stage of the

litigation, may not be obstinate at another. At the same time, "obstinacy may be found to characterize a particular form of conduct in one case but not in another." *Dopp v. Pritzker*, 38 F.3d at 1253–54.

### The Findings

According to plaintiff, GIFFIN was obstinate in not admitting the failure of the oven to meet the cook cycle specification of "45 minutes, approximately." We agree. The Court finds that defendant incurred in obstinate conduct by denying a fact which was both previously known to it and indisputably proven at trial, namely, that the oven sold to plaintiff did not perform according to the "45 minutes-approximately" cook cycle time operational specification. The evidence clearly establishes that GIFFIN was aware of this detail well before this litigation commenced and it presented no evidence whatsoever to dispute this fact. Indeed, as the evidence at trial clearly demonstrated, GILKES—the contractor that GIFFIN itself hired to test the oven and assist GIFFIN's personnel including engineer LANGE (the GIFFIN engineer in charge of testing and start up of the oven)—advised GIFFIN point blank that it was *impossible* to cook CENTURY's sausages with the characteristics of CENTURY's finished product in anything close to the forty-five-minute specification. LANGE himself, on May 22, 2002, admitted to VAZQUEZ at a meeting held at CENTURY that the oven *did not* meet the cook cycle time specification. In fact, LANGE's own handwritten notes of said meeting submitted as an exhibit at trial by GIFFIN, specifically acknowledged that "we *cannot* meet the specification" (emphasis ours). Based on the foregoing, GIFFIN's denial of this fact throughout the proceedings constitutes ample grounds for a finding of obstinacy.

Additionally, defendant's obstinacy is manifested by its insistence in maintaining a position—that the term cook cycle only meant achieving a certain internal temperature—a totally spurious argument with no basis in fact or law and contrary to the meaning ascribed to the term in the meat processing industry.

Defendant's bad faith in litigating was also manifested by its insistence in creating discovery and pretrial controversies devoid of merit, which resulted in excessively costly and time-consuming activities that were disproportionate to the nature of the case, the amount involved, or the issues at stake. *See* Fed.R.Civ.P. Rule 26 Advisory Committee Notes. *See e.g.,* docket Nos. 81, 89.

Further, defendant's failure to conduct earnest settlement negotiations throughout the litigation nor propose any fair and reasonable settlement offer during the multiple opportunities afforded during the extended discovery proceedings made necessary litigation which could have been avoided, forced CENTURY to needlessly assume the pain, costs, efforts and inconveniences of litigation and constituted a waste of this Court's time and efforts. This unreasonable and intransigent position was held by GIFFIN throughout this litigation and even after CENTURY, on June 17, 2004, waived most of its damages claims in a good faith effort to accommodate defendant and try to settle this case. Indeed, even at the Pretrial/Settlement Conference held before the Court on March 16, 2006, a few days before trial was set to commence, defendants maintained its obstinate posture and continued to reject plaintiff's settlement efforts. At trial, the strength of CENTURY's case made it evident that CENTURY would prevail on its claim for breach of contract. Yet, GIFFIN never made any settlement offer during the five days of trial.

Lastly, GIFFIN's stubborn denial of the oven's failure to meet the cook cycle speci-

fication is further compounded by its blanket denial of all liability and the filing of a counterclaim against Century seeking to collect the balance of the oven's purchase price.

Finally, we note that we have reached the conclusion that GIFFIN acted obstinately without considering its contentious conduct during discovery and other pretrial proceedings. Such consideration would most probably have heightened the Court's finding of obstinacy.

### Conclusion

Based on the foregoing, the Court finds for the plaintiff in the claims asserted in the complaint. Accordingly, it is hereby ORDERED as follows:

1. The contract subscribed by and between CENTURY and GIFFIN on June 13, 2000 is hereby **RESCINDED.**

2. GIFFIN shall reimburse CENTURY the sum of **$275,022.91** which constitutes the *total* amount paid by CENTURY to GIFFIN for the oven.

3. Title to the oven is vested in GIFFIN.

4. GIFFIN is liable for payment of legal interest on the amount of $275,022.91 at the rate of six percent (6%) [6] as provided for in P.R. Laws Ann. tit. 31 § 3514 (1991) calculated from the date of each installment made by CENTURY until the entry of Judgment.

5. Special damages are awarded to CENTURY in the total amount of **$28,120.00** itemized as follows:

    a. Expenses incurred by CENTURY for warehousing of the oven: **$3,080.00;**

    b. Freightage costs incurred by CENTURY for transportation of the oven from its facility in Caguas, Puerto Rico to the warehouse in Zeeland, Michigan, where the oven is presently stored: **$5,146.00;**

    c. Expenses incurred by CENTURY in having the oven dismantled: **$19,894.00;**

6. Attorneys' fees pursuant to Rule 44.1(d) P.R. Rules Civ. P.

7. Costs incurred by CENTURY recoverable under Puerto Rico Rule of Civil Procedure 44.1(a).

8. Post-judgment interest at the rate of eight percent (8%) [7] on the total amount awarded to CENTURY in the Judgment, including costs and attorneys' fees, from the date of entry of the Judgment until said Judgment is satisfied, as provided in Puerto Rico Rule of Civil Procedure 44.3(a), P.R. Laws Ann. tit. 32, App. III, R. 44.

Plaintiff shall file within ten (10) days from the entry of Judgment a memorandum of costs and expenses as provided in Puerto Rico Rule of Civil Procedure 44.1(b).

Plaintiff shall file within thirty (30) days from the date of the notice of this Opinion and Order a motion itemizing the attorneys' fees expended in prosecuting this litigation. Defendant's counterclaim is DISMISSED.

Judgment shall be entered accordingly.

IT IS SO ORDERED.

---

6. P.R. Laws Ann. tit. 31 § 3025 (1991).

7. P.R. Laws Ann. tit. 10 § 998 (1997).